Angel DIAZ, Denise L. Motley, and Reynaldo Coholo, Plaintiffs,

v.

Sheldon SILVER, in his official capacity as Speaker of the House for the Assembly of the State of New York; Joseph L. Bruno, in his official capacity as President Pro Tem and Majority Leader of the Senate of the State of New York; George E. Pataki, in his official capacity as Governor of the State of New York; The Board of Elections of The State of New York; Owen T. Smith, Evelyn J. Aquila, and Helena M. Donohue, in their official capacities as commissioners of the Board of Elections of the State of New York; and John Does 1 Through 50, the names of such defendants being fictitious and unknown to plaintiffs, and referring to those persons who are responsible in their official capacities for the enforcement of the legislation that created New York's federal congressional districts; Defendants.

Civil Action No. 95–CV–2591
(JMM, SJ, DGT).

United States District Court,
E.D. New York.

Feb. 27, 1997.

---

Robert D. Popper, New York City, for Plaintiffs.

Delco L. Cornett, pro se.

C. Daniel Chill, Graubard Mollen & Miller, New York City, for Sheldon Silver.

Joe Graber, Assistant Attorney General, NYS Dept. of Law, New York City, for George E. Pataki, Joseph L. Bruno and the Board of Elections of the State of New York.

Arthur A. Baer, Puerto Rican Legal Defense and Education Fund, Inc., New York City, for Margarita Lopez and Luis Garden Acosta.

Elizabeth R. OuYang, Asian American Legal Defense and Education Fund, Mark D. Beckett, Latham & Watkins, New York City, for Peter Lau and John Kuo Wei Tchen.

Paul Wooten, Brooklyn, NY, for Nydia Velazquez and Major R. Owens.

Carolyn B. Maloney, pro se.

Before McLAUGHLIN, Circuit Judge, and JOHNSON and TRAGER, District Judges.

### MEMORANDUM AND ORDER

PER CURIAM:

Plaintiffs, who are Latino and African–American, seek a declaratory judgment and a permanent injunction against the further use of the current configuration of New York State's 12th Congressional District on the ground that it violates their constitutional rights under the Fourteenth and Fifteenth Amendments to the United States Constitution. Before the court is their motion for summary judgment and defendant-intervenor Puerto Rican Legal Defense and Education Fund's cross-motion for summary judgment.

### Background

#### (A) The Parties

Plaintiffs are residents and registered voters of the 12th Congressional District ("12th CD") of New York. *See* Second Amended Complaint ("Compl.") ¶¶ 1–4. Plaintiffs Diaz and Coholo are Puerto Rican.[1] *Id.* ¶ 56.

---

**1.** Plaintiffs, as residents of the district, have standing to bring suit. *See United States v. Hays,* 515 U.S. 737, 744–45, 115 S.Ct. 2431, 2436, 132 L.Ed.2d 635 (1995) ("Where a plaintiff resides in

Plaintiff Motley is African–American. *Id.* ¶ 60. Plaintiff Diaz ran for Congress in the 12th CD in the 1992 general election as a "Republican Conservative." Diaz Decl. ¶ 3.

Defendants, in their official capacities, are responsible for the enactment or enforcement of the legislation that created the congressional districts in New York. *See* Compl. ¶¶ 5–11. In addition, there are many intervenors in this suit. Delco Cornett is a pro se plaintiff-intervenor. Two Latino voters who live in the 12th CD, Margarita Lopez and Luis Garden Acosta, who are represented by the Puerto Rican Legal Defense and Education Fund ("PRLDEF"), have intervened on behalf of defendants. *See* PRLDEF Mem. Sup. Intervention at 1. Another group intervening on defendants' behalf consists of: Congressional Representative Nydia Velazquez, who represents the 12th CD; Major R. Owens, who represents an adjoining district which is majority African–American; and voters in the 10th, 11th, and 12th CDs. *See* Wooten Mem. Sup. Intervention at 4–7. They are being represented by Paul Wooten, Esq. In addition, the Asian American Legal Defense and Education Fund ("AALDEF") is representing defendant-intervenors Peter Lau and John Kuo Wei Tchen, residents of the 12th CD. *See* AALDEF Mem Sup. Intervention at 1. Finally, Congresswoman Carolyn B. Maloney has also intervened, pro se, to have her interests considered, as she the representative of the 14th CD, a tri-county district that adjoins the 12th CD.

**(B) The 1992 Redistricting Process**

**(1) An Overview of the Redistricting Process**

Initial responsibility for congressional redistricting lies with the New York State Legislature. However, because Bronx, New York, and Kings Counties are "covered" jurisdictions under the Voting Rights Act, 79 Stat. 437, as amended, 42 U.S.C. § 1973 et seq. ("VRA"), any legislative alteration of voting procedures, including redistricting, required preclearance by the U.S. Department of Justice ("DOJ") before its implementation. *See* Compl. ¶ 23.

DOJ preclearance ensures that proposed redistricting complies with the provisions of the VRA, particularly § 2, which forbids the abridgement of voting rights "on account of race or color." 42 U.S.C. § 1973 (Supp. 1994). Under the VRA, a redistricting plan that provides "less opportunity [to minorities] than other members of the electorate to participate in the political process and to elect representatives of their choice" abridges voting rights. *Id.*

DOJ had interpreted this provision to require that a redistricting proposal maximize the number of majority-minority (i.e. non–Caucasian) districts. In 1995, the Supreme Court rejected the maximization interpretation of the VRA. *See Miller v. Johnson,* 515 U.S. 900, 923–28, 115 S.Ct. 2475, 2492–94, 132 L.Ed.2d 762 (1995) (rejecting DOJ's maximization policy as "a shortsighted and unauthorized view of the Voting Rights Act").

The 1990 U.S. census revealed that New York's population growth was slower than other states. Consequently, New York's congressional delegation had to be reduced from 34 to 31 members. *See* Compl. ¶ 15. In 1991, the New York State Legislature established a task force to create a new congressional districting plan. *See* Compl. ¶ 16. Both the Senate and Assembly were fully cognizant of the Department of Justice's modus operandi with regard to preclearance and VRA § 2. New York had previously encountered DOJ objections to the proposed redistricting of the New York City Council in 1991, as well as to the proposed redistricting of the State Senate and Assembly in 1992. *See* Ex. N of PRLDEF Opp. Prelim. Inj., Ltr. of U.S. Ass't Atty. Gen'l, dated June 22, 1982 (finding that New York State's 1982 Legislative plan discriminated against Latino voters); Ex. O of PRLDEF Opp. Prelim. Inj., Leg. History of 1982 VRA Amendments

a racially gerrymandered district, ... [that] plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action."). Moreover, notwithstanding that two of the plaintiffs are Latino (as are the majority of the district's residents), they have standing because they can suffer stigmatization and hostility by virtue of their race. *See Shaw v. Reno,* 509 U.S. 630, 643, 113 S.Ct. 2816, 2824–25, 125 L.Ed.2d 511 (1993).

(finding that Latino voters were discriminated against in the redistricting of the New York City Council after the 1980 census); Ex. P of PRLDEF Opp. Prelim. Inj., DOJ Ltr. dated July 19, 1991 at 2 (explaining that Latinos were "unfairly underrepresented on the council. In one area, the proposed configuration of district boundary lines appears to have been drawn in such a way as to minimize Hispanic voting strength"); Ex. Q of PRLDEF Opp. Prelim. Inj., DOJ Ltr. dated June 24, 1992 at 2–3 (objecting to the proposed Assembly redistricting plan and noting that "[a]lthough incumbency protection is not in and of itself an inappropriate consideration, it may not be accomplished at the expense of minority voting potential").

By March of 1992 partisan politics had deadlocked the task force.[2] *See* Compl. ¶ 17; Aff. of C. Daniel Chill, Esq., counsel for defendant Silver ("Chill Aff.") ¶ 4. because New York law mandated that the candidate-petitioning process commence on June 9, 1992, a state court action, *Reid v. Marino*, No. 9567–92 (N.Y. Sup.Ct. Kings Cty.1992), was filed on March 26, 1992 "to compel the development of a satisfactory redistricting plan." Compl. ¶¶ 17–18; see New York Election Law §§ 6–158(1), 6–134(b), 8–100. On March 31, 1992, a similar action was filed in federal court in the Eastern District of New York, *PRLDEF v. Gantt*, No. 92–CV–1521 (E.D.N.Y.1992). *See* Chill Aff. ¶ 11. This suit alleged "that New York's then existing congressional map denied Latino voters their right to vote in violation of the Voting Rights Act of 1965, as amended, and the Fourteenth and Fifteenth Amendments to the United States Constitution and 42 U.S.C. § 1983." Affirmation of Arthur A. Baer, Esq., counsel for PRLDEF, ("Baer Affirm.") ¶ 10.

The Eastern District three-judge panel appointed Hon. Frederick B. Lacey ("Lacey"), a retired United States District Judge, as special master and ordered him to develop a redistricting plan that would comply with federal law. *See PRLDEF v. Gantt*, 796 F.Supp. 681, 684 (E.D.N.Y.1992). Lacey filed his plan with the court on May 26, 1992. *See id.* The three-judge court adopted this plan in its entirety on June 26, 1992. *See id.* at 698.

At about the same time, in *Reid v. Marino*, the state court appointed a panel of three referees to develop a plan that would comply with federal and state law. The state court adopted the referees' plan on June 8, 1992. *See* Compl. ¶ 21.

The special master's plan differed from the referees' plan in the number of majority-Hispanic and African–American districts created. With a statewide Latino population of 12.31%, the special master's plan provided for three majority-Latino districts out of thirty-one districts in New York (9.68%), while the referees' plan proposed two such districts (6.45%). With a statewide African–American population of 15.9%, the special master's plan created four majority-African-American districts (12.90%), while the referees' plan provided five majority-african-american districts (16.12%).

The New York State Legislature then had to decide whether to enact a bill that incorporated the referees' redistricting plan. In the event that the Legislature failed to do so, the federal special master's plan would take effect. The New York State Legislature enacted the bill incorporating the referees' plan and the Governor signed it soon thereafter. *See* Compl. ¶ 22. On July 2, 1992, the U.S. Department of Justice precleared the plan, and it became law. *See id.* ¶ 25.

**(2) The Latino Population in New York City**

According to the 1990 census figures, "[t]here are nearly two million Latinos in New York City, comprising 24.36% of New York City's population." Baer Affirm. ¶¶ 2, 25. In addition, Latinos represent 23.07% of New York City's voting age population

---

2. According to Senator Skelos, the plan that was eventually passed by the Legislature "represents about 90 percent of the agreement which was reached between the two houses of the Legislature." Ex. R of Aff. of C. Daniel Chill, Esq., counsel for defendant Silver, in Support of Silver Opp. Sum. Judg. ("Silver Opp. Sum. Judg."), Senate Tr. at 36. The record is unclear as to exactly what comprised the ninety percent that was incorporated into the plan and ultimately became law.

("VAP"). *See id.* ¶ 26. Statewide, Latinos represent 12.31% of the total population and 11.20% of New York State's voting age population. *See id.* ¶ 27.

According to PRLDEF, Latino citizens of New York City "bear the effects of historic discrimination in the areas of voting, employment, education, and housing, suffer depressed socio-economic conditions, and have traditionally low voter registration and turn out." *Id.* ¶ 41; *see also* Ex. R of PRLDEF Opp. Prelim. Inj., Order in *Ortiz, et al. v. New York State Bd. of Elections, et al.,* No. 74–CV–455 (W.D.N.Y. July 10, 1975) (holding that New York's English-only election violated Latino voters' voting rights and ordering remedial relief); Ex. U of PRLDEF Opp. Prelim. Inj., "A Call to Action III"; Ex. V of PRLDEF Opp. Prelim. Inj., "Poverty in New York City, 1991: A Research Bulletin"; Ex. W of PRLDEF Opp. Prelim. Inj., "OREA Report" (discussing high school dropout rates); PRLDEF Hem. Opp. Prelim. Inj. at 54–67 (documenting the history of social and economic discrimination of Latinos).

PRLDEF argues that discrimination has impacted Latino participation in politics. As of 1990, Latinos constituted only 1 of 13 (7.7%) of New York City's congressional delegation, 2 of 25(8%) of New York City's State Senate delegation, 4 of 60 (6.7%) of New York City's Assembly delegation, and 3 of 35 (8.6%) of New York City's Council members. *See* Baer Affirm. ¶ 51; Ex. S of PRLDEF Opp. Prelim. Inj., Compendium of Latino Elected Officials in New York City. PRLDEF claims that "Latino electoral candidates in New York City have been historically negatively impacted by polarized bloc voting." Baer Affirm. ¶ 33. Latino voter participation in elections in New York is depressed. *See* Baer Affirm. ¶ 56. Theodore S. Arrington, a Professor of Political Science at the University of North Carolina, has stated:

> [T]he social and economic position of African–American citizens and language minorities in New York, particularly those in New York City and surrounding counties, disadvantages them politically. They have had inferior opportunities to participate in the political process as a whole and to elect candidates of their choice. It also appears that compared to other citizens they have lower rates of voter registration and voter turnout, and are less likely to run for office or otherwise participate actively in the political process. When the effects of racially polarized voting are added to these factors, African–Americans, Hispanics, and Asians are confronted with an enormous barrier to equal participation and ability to elect candidates of their choice.

Ex. K of PRLDEF Opp. Prelim. Inj., Arrington Aff. ¶ 26.[3]

The extent of Latino political cohesion is unclear. Professor Arrington noted the inherent difficulty of combining the many ethnicities that make up the Latino community:

> Puerto Ricans may have very different concerns and interests than Hispanics from Central or South American countries. There may be disputes and inter-ethnic conflict between these groups. This would suggest that community of interest principles should lead to the formation, if possible, of a Puerto Rican district distinct from a district dominated by Dominicans, Colombians, and other Central and South Americans.

*Id.* ¶ 36. Professor Arrington further stated that the Latino community lacks cohesion.

> The Hispanic population is diverse ethnically and racially, and it sometimes lacks the degree of cohesion that is present in the African–American population. Therefore, it is wise to keep the percentage of Hispanic voting age population in a district relatively high.

*Id.* ¶ 32.

However, PRLDEF argues that the "Latino community in New York City is . . . politically cohesive." Baer Affirm. ¶ 38. Allan J. Lichtman, Professor of History at The American University, who was retained by defendant-intervenors PRLDEF in the federal action *PRLDEF v. Gantt,* No. 92–CV–1521

---

**3.** Professor Arrington, who assisted special master Lacey in his redistricting efforts pursuant to *PRLDEF v. Gantt,* No. 92–CV–1521 (E.D.N.Y.), made these statements in an affidavit submitted to the court in that action.

(E.D.N.Y.1992), also analyzed Latino voting patterns and found:

> The elections examined thus far show a pattern of polarized voting between Latinos and non-Latinos in elections with Latino and non-Latino candidates. The cohesion of Latino voters is extremely strong: almost invariably a substantial majority of Latino voters united behind Latino candidates. The pattern among non-Latino voters is more mixed given the multi-racial character of the non-Latino vote (blacks, Asians, and non-Hispanic whites). Still, a substantial majority of non-Latino voters typically lined up behind non-Latino candidates, especially in city council contests.

Ex. I of PRLDEF Opp. Prelim. Inj., Lichtman Decl. ¶ 7.

With respect to the 12th CD, Plaintiff Diaz claims that the district is "very diverse," including "Dominicans, Ecuadorians, Panamanians, Mexicans, Cubans, Colombians, and others," Diaz Decl. ¶ 5, and that "these groups tend to have different political concerns." *Id.* ¶ 12; *see also* ¶¶ 13–20. Further, plaintiff Diaz states: "In my experience the 12th CD did not contain a single community of interest. The people in Manhattan had obviously different local concerns than the people in Queens and Brooklyn. The voters did not seem to think the 12th CD was a community. Most were confused about whether they resided in the district or not." *Id.* ¶ 25–26.

### (3) The Asian Population in New York City

The 1990 census reported that there were 512,719 Asian Americans living in New York City, of whom 228,085 "did not speak English very well." Affidavit of Michael Shen, President of the Board of Directors of AALDEF ("Shen Aff.") ¶ 21. According to the New York City Voter Assistance Commission, only twenty-six percent of eligible Asian–Americans were registered to vote in 1994. *See id.* ¶ 20.

Shen claims that "the lack of bilingual ballots and assistance has been a major impediment for Asian Americans seeking to participate in the political process." *Id.* ¶ 19. In addition, AALDEF asserts that its monitoring of a variety of polling sites from 1991 to 1993 revealed that Asian–American voters were "harass[ed] by poll workers, haphazard[ly] distribut[ed] bilingual materials" and given inaccurate translations of materials. *Id.* ¶ 25. In 1994, DOJ, pursuant to § 5 of the VRA, required "machine ballots [to] be fully translated into Chinese, including the candidates' names." *Id.* 26.[4]

As with the Hispanic population, the degree of political cohesiveness within the Asian–American population is in question. AALDEF has conducted exit polls that "confirm that Asian Americans vote cohesively for Asian Americans when they are on the ballot." *Id.* ¶ 7. Somewhat contradictorily, however, AALDEF claims that although Asian–Americans have become an "influential minority in New York," *id.* ¶ 28, "[t]he arbitrary drawing of district lines ... has inhibited the Asian American community's ability to organize and develop a strong political cohesiveness." *Id.* ¶ 29.

AALDEF has also submitted an affidavit from Peter Lau, a defendant-intervenor and President of the Chinatown Voter Education Alliance, stating that he has reviewed official election results and has determined that Asian–American voters in Chinatown and Sunset Park are politically cohesive. *See* Lau Aff. ¶¶ 2, 45–51. Mr. Lau reports that in the November 1991 New York City Council general election in District 1, "76% of all Asian Americans voted for one of two Asian American candidates." *Id.* ¶ 48.[5] Mr. Lau

---

4. AALDEF also produces affidavit evidence that Asian Americans in New York have faced discrimination in areas other than voting. *See* Lau Aff. ¶¶ 10–28 (discussing anti-Asian violence, police brutality and hate speech against Asian Americans that have occurred in New York); Tchen Aff. ¶¶ 39–44 (describing a variety of hate crimes and discrimination occurring in New York); Shen Aff. ¶¶ 34–40 (recounting New York

elected officials' and candidates' derogatory remarks about Asian candidates).

5. Mr. Lau cites additional statistics that indicate racial bloc voting by whites, but do not appear to support his claim of Asian–American political cohesion. For example, in the September 1991 Democratic New York City Council Primary in District 1, 47% of Asian–American voters supported the Asian–American candidate who lost,

suggests that "definitive election analysis would require accumulating additional data, in part because so few Asian Americans have run for elective office, and in part because of their low registration and voter turnout." *Id.* ¶ 50.

Mr. Lau also asserts that Chinatown and Sunset Park "are locked together as one community." *Id.* ¶ 52. "Many cultural ties link the two neighborhoods together." *Id.* ¶ 54. According to Mr. Lau:

Sunset Park is the progeny of Chinatown. According to the 1990 census, although Sunset Park is relatively small, it is a growing community. The Asian–American population in Sunset Park has grown almost 200% since the 1980 Census. Historically, pragmatically, and culturally these two neighborhoods are interdependent. Asian Americans in Sunset Park and Chinatown form a single cohesive community. . . .

*Id.* ¶ 55. John Kuo Wei Tchen, now Director of the Asian American Studies Program and Institute at New York University, agrees. He submits that "[l]abor force, limited English proficiency and shared community resources all tie these two neighborhoods together into one community." Tchen Aff. ¶ 18. Many residents of Sunset Park work and shop in Chinatown. *See id.* ¶¶ 20–22, And, "many service industries and community organizations . . . minister to both neighborhoods," including Chinese daily newspapers, medical services and community agencies. *Id.* ¶¶ 25–30. Moreover, residents from both communities came from Hong Kong and Southern China and speak the Cantonese dialect of the Chinese language. *See id.* ¶ 24.

#### (4) The Referees' Plan

According to plaintiffs:

The Referees' Report is the single most important document that explains that district plan. Made contemporaneously with the district plan by the very individuals

who were charged with drawing it, the Referees' Report clearly sets out the findings upon which the drafters relied, the interpretation of the Voting Rights Act that guided their thinking, and the methodology they used to configure New York's congressional districts.

Pltff Mem. for Prelim. Inj. at 12 (footnote omitted).

In addition to the referees' report and plan, plaintiffs rely upon the court hearings in *Reid v. Marino.* During these hearings, Professor Alan Gartner, whom the referees retained to draw the districts, "discussed the Referees' Plan in almost exclusively racial terms." Compl. ¶ 36. At the time, Dr. Gartner was Director of Research for the Graduate School and University Center of the City University of New York.

#### (a) Racial Criteria in the Creation and Methodology of the Referees' Plan

According to the referees' report, their redistricting plan incorporated the following criteria: "The one person, one vote standard of the United States Constitution; The Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, *et seq.;* Public interest criteria including contiguity, compactness, traditional boundaries in the State, communities of interest, and political fairness." Ex. C of PRLDEF Opp. Prelim. Inj., Referees' Report at 15. The referees determined that "[f]ederal law mandates that congressional redistricting plans must meet two primary requirements: the one person, one vote standard and the racial fairness standard." *Id.* at 17. They defined "racial fairness" as compliance with §§ 2 and 5 of the Voting Rights Act of 1965. *Id.* at 19–21.

The referees explicitly state in their report that they utilized racial data in a computer program to generate the new districts:

Based upon the Board of Elections registration list, using surname dictionaries to identify Hispanic and non-Hispanic Asians,

---

while 51% of white voters supported the winner of the primary. *See* Lau Aff. ¶ 47. In District 1's September 1993 primary election, one Asian-American candidate ran against two white candidates. Forty-seven percent of Asian–American voters supported the Asian candidate. Approxi-

mately 65% of white voters supported one white candidate and 19% of white voters supported the other. *See id.* ¶ 49. In both of these instances, it seems that a majority of Asian–American voters supported Caucasian candidates.

and then census-based estimates to identify non-Hispanic blacks and whites, an estimate of registration by race for New York City was developed. This was loaded on the REAPS system. Using REAPS, the referees not only were able to see how various minority districts (and the various racial and language groups within the same district) compared at the total population and voting age population levels, but also at the estimated registered voter level. In this manner, the Referees could "compensate" those districts in which large numbers of protected minorities with low citizenship rates resided, such as ... Hispanics in Northern Manhattan and Central Queens.

*Id.* at 33 n. 32. The referees first relied on the voting-age population ("VAP") to gauge minority voting strength and then refined this analysis using the estimated voter registration by race data and surname analysis to measure voting strength more precisely. *See id.* at 33.

During the court hearings in *Reid v. Marino,* Dr. Gartner described his use of the computer software:

[O]ne of the things that the computer can do is it can produce maps which translate the Census numbers into geography, showing you, for example, concentrations of particular population groups. And so, we produced a set of maps that show the concentrations of the three so-called "protected classes" in New York City; in Census language: "Non–Hispanic blacks, non-Hispanic Asians," and "Hispanics."

In effect, those concentrations tell you how to do the districting, per the Voting Rights Act. And, the order in which I will describe these districts, in effect, reflects our using those concentrations as the basis.

Ex. 7 of Chill Aff. in Support of Silver Mot. to Dismiss ("Silver Mot. to Dismiss"), June 2 Tr. at 111.

On June 5, 1992, Dr. Gartner testified that the computer was programmed to permit easy identification of racial concentrations: "[t]he richer the shade (indicating) ... the more intensive the [racial] population group." Ex. 9 of Silver Mot. to Dismiss, June 5 Tr. at

236. He also described the method in which the districts were drawn:

[W]e were concerned with the percent of non-Hispanic whites in a district.

We were concerned ... to keep that percentage down so we do not, in effect, violate the opportunity of a so-called "protected class." Or a group of protected classes in a district to have their rights violated by another group, who may tilt or switch the election.

*Id.* 233–34.

Professor Bernard Grofman, an expert who aided the referees, developed a four-step plan to ensure compliance with the VRA. One step entailed grouping "clusters of minority concentration" to maximize the number of districts having both the required population size to meet the "one person, one vote" standard and "effective minority voting equality." Ex. C of PRLDEF Opp. Prelim. Inj., Referees' Report at 23–24 n. 19. Such a scheme maximized the number of new majority-minority districts. The referees themselves specifically asserted that "where the minority populations were large and compact enough, the maximum number of districts which achieve 'effective minority voting equality' have been created." *Id.* at 3.

With regard to the factor of compactness, however, the referees acknowledged:

[O]ur Plan includes a newly created tri-county Hispanic district [the 12th CD] which, although not "aesthetically" compact, was drawn in a manner to ensure an effective concentration of Hispanic voters that can elect the candidate of their choice.

*Id.* at 26. Moreover, Professor Gartner, discussing the 12th CD in particular, noted that "looking at the concentration maps, ... if you're not bound by *antiquated notions of compactness* ... an additional Hispanic seat ... the so-called 'Tri–County Seat'" may be developed. Ex. 7 of Silver Mot. to Dismiss, June 2 Tr. at 123 (emphasis added). A few days later he testified: "I believe it [the 12th CD] is the best Hispanic district you could draw, as well as also the best Asian district you can draw.... [However,] it is aestheti-

cally unpleasing." [6]  Ex. 9 of Silver Mot. to Dismiss, June 5 Tr. at 243.

Finally, when the referees compared their plan to those submitted to them, they briefly discussed the population equality standard and then carefully described the plans' racial characteristics. *See* Ex. C of PRLDEF Opp. Prelim. Inj., Referees' Report at 40–51. In their final report, the referees provided a compendium of the racial composition of the minority districts. *See id.* at 34–40. For each district, the only characteristic analyzed was voters' race. *See id.; see also* Ex. 5 of Declaration of Robert D. Popper, Esq., counsel for Plaintiffs ("Popper Decl."), chart entitled: "Congress Plan State Racial Breakdown."

### (b) Secondary Criteria in the Referees' Plan

As previously mentioned, the referees considered the 'one person, one vote' standard and "racial fairness" primary to their redistricting efforts. *See* Ex. C of PRLDEF Opp. Prelim. Inj., Referees' Report at 17. Other factors are described as secondary criteria which "may" be considered:

> In addition to the two critical statutory and constitutional criteria, several other factors may be considered. These include contiguity, compactness, respect for traditional boundaries (such as county lines), communities of interest, and political fairness.

*Id.* at 24.

This summary, however, clearly does not tell the full story of all of the factors employed when developing the plan. For example, incumbency per se is never explicitly mentioned; it appears only as the veiled term "displace[ment]" of constituents.[7] *See id.* at 51–52.  Despite its conspicuous ab-

sence from any direct discussion, incumbency appears to have been the unacknowledged third-most-significant factor used when redistricting. It is not contested that the 12th CD was the only district created by the referees in which an incumbent did not reside. Incumbents were "protected" in 87% of the new districts: twenty-seven districts were created with incumbents and three had two incumbents. *See* State Mem. Opp. Prelim. Inj. at 28; Ex. C of PRLDEF Opp. Prelim. Inj., Referees' Report at 29.

In addition, the lack of compactness of the new districts evidences that incumbency was the unspoken third criterion. Many of the congressional districts maintained the borders of prior districts and thus are not very compact. Two CDS conjoin non-adjacent communities separated by both land and water. The 5th CD connects northeast Queens with northern Nassau and Suffolk counties, via the Long Island Sound.[8] *See* PRLDEF Mem. Opp. Sum. Judj. at 33. The 8th CD combines the Upper West Side, the West Village, Soho, Tribeca and Battery Park City of Manhattan with the southeastern parts of Brooklyn, including Brighton Beach and Coney Island, as well as Borough Park, in central Brooklyn. *See id.* at 34.

Moreover, the 9th CD contains significant portions of Brooklyn and Queens including: Park Slope, Canarsie, Rockaways, Sheepshead Bay, Forest Hills, Howard Beach, Woodhaven, Forest Hills and Kew Gardens. Pieces of the 10th, 11th, and 12th CD intersperse the 9th CD. *See id.*

The plan provides for two other tri-county districts in addition to the 12th CD. The 18th CD connects the Bronx, Queens and Westchester County beginning in southern West-

---

6.  Interestingly, the referees and their experts appear never to have considered the possibility of a more compact majority-Latino district in Manhattan. They discuss it only in the context of comparing the special master's plan to their own, only to reject the viability of such a district. *See* Ex. C of PRLDEF Opp. Prelim. Inj., Referees' Report at 54. The significance of this omission will become apparent when we discuss the factor of incumbency in the Discussion section (§ (D)(1)).

7.  The goal of incumbency is to minimize the number of voters whose representative will

change solely due to the redrawing of district lines. This "protects" incumbents because it preserves their base of political support in the district.

8.  This district has been described as non-contiguous: "At several points the district is connected across open water, and anyone wishing to traverse its boundaries from one end of it to the other better be a good swimmer." Michael Barone et al., *The Almanac of American Politics 1996* 918 (1995).

chester into the East Bronx and then crossing the East River into central Queens. *See id.* at 35. And the 14th CD combines parts of Brooklyn, Manhattan and Queens, including parts of the Upper East and West Sides and the Lower East Side, as well as Greenpoint in Brooklyn and Astoria in Queens. *See id.* at 34–35.

Despite this disregard for compactness, the State Supreme Court found that the referees' proposed plan was "complete and valid under the constitutions of the United States and the State of New York as well as the Federal Voting Rights Act." Ex. X of PRLDEF Opp. Prelim. Inj., Order and Judgment in *Reid v. Marino,* No. 9567–92 (N.Y. Sup.Ct. Kings Cty.1992) at 3. According to the state court, the referees' plan was also "the only one presently before any court that fully comports with these requirements and other applicable criteria as set forth in the referees' report." *Id.* at 4.

**(5) The Special Master's Plan**

Like the referees, the special master considered the population equality and VRA mandates most crucial when creating his plan for the federal court. However, "[a]fter complying with constitutional and Voting Rights Act requirements, a redistricting plan may properly consider a 'wide array of secondary or equitable criteria.' " Ex. B of PRLDEF Opp. Prelim. Inj., Special Master's Report at 29 (citation omitted). For these criteria, the special master relied upon *Good v. Austin,* 800 F.Supp. 551, 554 (E. & W.D.Mich.1992), which states: "Federal courts have recognized the following as relevant secondary criteria: compactness, contiguity, preservation of the integrity of county and municipal boundaries, maintenance of the cores of existing districts, preservation of cultural, social, and economic communities of interests, and political and racial fairness."

As did the referees, the special master maintained that he was required not to disperse minorities into districts so that they would constitute an ineffective minority of voters; nor was he required to concentrate minorities into districts so that they would be an excessive majority. *See* Ex. B of PRLDEF Opp. Prelim. Inj., Special Master's Report at 19. Additionally, although the special master did not explicitly state that he attempted to maximize the number of majority-minority districts, it appears that he did, since he created the same number of such districts as the referees, who specifically proffered maximization as a goal. *See* Ex. C of PRLDEF Opp. Prelim. Inj., Referees' Report at 3, 51. Most significantly, the special master and the referees used the same race-sensitive computer program, REAPS, to design their respective plans. *See* Ex. B of PRLDEF Opp. Prelim. Inj., Special Master's Report at 5–6. This is strong evidence of majority-minority district maximization in the special master's plan as well.

The special master afforded least weight to the "public interest" factors. *See id.* at 29. These included the "community of interest," which the special master defined as " 'distinctive units which share common concerns with respect to one or more identifiable features such as geography, demography, ethnicity, culture, socio-economic status or trade.' " *Id.* at 30 (quoting *Carstens v. Lamm,* 543 F.Supp. 68, 91 (D.Colo.1982)). In addition, the special master took into account political fairness, described as drawing district lines "so as not to disproportionately advantage or disadvantage one political party or another." *Id.* at 31. Finally, he considered compactness and contiguity "[t]o the extent that these factors did not impair my ability to comply with constitutional and Voting Rights Act requirements...." *Id.* at 36. The special master explained that he created districts

> [t]hat are compact and contiguous where satisfaction of the provisions of the Voting Rights Act is not an issue. In New York City, where Voting Rights Act concerns dictated many of my districting decisions, the proposed districts are less compact but nonetheless compare favorably with the districts drawn for New York City by other plan proponents.

*Id.* at 37 (citation omitted).[9] Following the direction of the court, however, he did not

---

**9.** It is not clear that either this claim by the special master or the claim by the state court

consider protection of incumbents. *See id.* at 34.

### (6) The Referees' and the Special Master's Plans Compared

The referees' plan and the special master's plan differ in two essential ways: the number of majority-Latino districts created and the inclusion of incumbency as a factor in redistricting. Importantly, however, both plans do envision a tri-county majority-Latino district.

Both the special master's and the referees' plans created seven majority-minority districts. *See* Ex. C of PRLDEF Opp. Prelim. Inj., Referees' Report at 51. As previously noted, however, the referees' plan, effectively created two Latino districts and five African–American districts, *see id.* at 34, while the special master's plan created three Latino districts and four African–American districts. Ex. B of PRLDEF Opp. Prelim. Inj., Special Master's Report at 37. With regard to the special master's creation of the third majority-Latino district, the referees wrote:

> The Special Master draws a third Hispanic district in the Bronx and Manhattan; it is 59% Hispanic, and 40% Hispanic voter registration, including the Washington Heights Dominican community making this marginal Hispanic district less secure because of low citizenship rates. Our plan includes a Bronx/Westchester district, which is 36% African–American VAP [voter age population], 26% Hispanic VAP and 3% Asian VAP, for a total minority VAP, of 67%.

Ex. C of PRLDEF Opp. Prelim. Inj., Referees' Report at 54.

The special master's plan described its creation of seven majority-minority districts:

The plan creates seven districts affording majority control to racial and language minorities. Four are African–American districts and three are Hispanic districts. Each of these control districts contains at least 55 percent or more voting age population ("VAP") for a protected minority. In the opinion of Professor Arrington, the Plan performs at least as well and usually better than other plans submitted to the Court in maximizing African–American and Hispanic voting power.

Ex. B of PRLDEF Opp. Prelim. Inj., Special Master's Report at 37 (citations omitted).

The second major point of comparison between the two plans is the inclusion of incumbency as a redistricting criterion. Incumbency was the third-most-significant factor in the referees' plan, whereas it played no role in the special master's. This allowed the special master to draw a Latino district in the Bronx and Manhattan that was far more compact and cohesive than that drawn by the referees.

The referees' report noted the disparity in the number of voters who would be displaced, i.e. whose representative would change, between their plan and the special master's:

> One of the most striking differences is that the Special Master's Plan splits six of the seven minority district [sic] between two or more counties. Our plan proposes four of its seven minority districts within a single county. . . .

> The Master's Plan, as compared to our plan, vastly changes the geography and, therefore, the constituencies of the five present minority districts in New York City. . . .

that the referees' plan was superior to all competing plans was correct. For example, at a hearing held by the special master, Assemblyman John Faso submitted the Assembly Republican Conference Plan which allegedly created a more compact, although less populous majority-Latino district. Assemblyman Faso stated:

> [T]he Voting Rights Act requires us to create opportunities for minority voters. However it does not require us to also destroy communities of interest which minority voters have like white voters and every other voter in our state

to have districts that are reasonably compact. As someone who represents an assembly district upstate, I can tell you that having a community fragmented and counties and jurisdictions fragmented makes it all the more difficult for one to represent that area. . . .

. . . [V]ery strange and odd looking configurations on the map do not necessarily improve representation or government.

Ex. L of Silver Opp. Sum. Judg., Special Master Hrg. Tr. at 28–29. The record does not indicate what the flaw was in Assemblyman Faso's plan.

... On the average, the Master's Final Plan 'displaces' 58% of the constituents, while the Referees' Final Plan 'displaces' only 25%.

Ex. C of PRLDEF Opp. Prelim. Inj., Referees' Report at 51.

Additionally, the special master created a tri-county majority-Latino district that was very similar to the one drawn by the referees. The comparable referees' district had additional curves, but the foundation of both plans was the same. Most importantly, as previously mentioned, the state referees and the federal special master used the same race-based computer program to determine the shape of the districts.

### (7) The New York State Legislature

### (a) Legislative Input in the Creation of the State and Federal court Plans

The Senate and the Assembly submitted their own redistricting plans to both the special master and the referees. The referees noted: "[a]ll the proposed plans submitted to the Referees and to Special Master Lacey, include a similar tri-county Hispanic District." Ex. C of PRLDEF Opp. Prelim. Inj., Referees' Report at 26 n. 22.

Legislators also voiced their opinions regarding the redistricting process at a hearing held by the special master. At this hearing, representatives from the Assembly and from the Senate were afforded the opportunity both to present their respective plans and to comment on each other's plan. While the Assembly's spokesperson, Dr. Roman Hedges, made a passing reference to incumbency, *see* Ex. L of Chill Aff. in Support of Silver Opp. Sum. Judg. ("Silver Opp. Sum. Judg."), Special Master Hrg. Tr., he primarily discussed the creation of majority-minority districts. Comparing the Assembly's plan to the Senate's, he stated:

[T]he big differences we think are in regards to treatment of the two Afro–American seats in Brooklyn where one of those two seats has a very substantial high turnout, white population that would significantly endanger the Afro–American seat currently held by Major Owens.

We don't see incumbency protection as an issue but we are very much concerned with retrogression. . . .

... [T]he rest of the differences between our plan and that proposed by the Senate are relatively small scale, and I would note a couple of things that seem to me to be in common with almost every plan, and that is there is the creation of a new Hispanic seat that goes from Brooklyn to Manhattan and to Queens which has a very consistent configuration of the Lower East Side, pieces of Jackson Heights and the Bushwick–East New York sections of Brooklyn.

*Id.* at 16–17.

The representative from the Senate, Mr. Michael Carvin, discussed the three majority-Latino districts it created, including its tri-county district. *See id.* at 88–92, 100–02. He explained: "What we do consistent with the Voting Rights Act is seek to group together concentrations of minority voters rather than split them apart, as is done certainly in the assembly plan and some of the others that have been presented." *Id.* at 89–90. Although the Senate and Assembly versions differed in the extent to which they prioritized the creation of an Asian–American influence district and, perhaps, incumbency, the primary purpose of both the Assembly and the Senate was to devise a second majority-Latino district. *See* Ex. Q of Silver Opp. Sum. Judg., Assembly Tr. at 4, 12–20; Ex. R of Silver Opp. Sum. Judg., Senate Tr. at 36, 71–72, 80–82. Carvin explained why the Senate, unlike the Assembly, had not aggregated Asian–American voters:

That is not in any sense disenfranchising or splitting Asian voters as we have heard here. What it does is allow them to continue in the district that they have participated in for years.

Ex. L of Silver Opp. Sum. Judg., Special Master Hrg. Tr. at 107.

### (b) Legislative Enactment of the Referees' Plan

### (1) The State Assembly

When Assemblyman David F. Gantt introduced the referees' plan to the Assembly, he

began by describing the criteria used in its creation:

> The plan according to the referees complies with the one person/one vote requirement of the United States Constitution, the Equal Rights Protection Clause of the Fourteenth Amendment, and the federal Voting Rights Act. *The maximum number of majority minority voting rights districts were created to ensur? compliance with the Voting Rights Act.*
>
> ... This plan creates an additional district that will help to ensure the election of the minority community's candidate of its choice.

Ex. Q of Silver Opp. Sum. Judg., Assembly Tr. at 3 (emphasis added). This statement serves as the backdrop for all further Assembly discussion.

Assemblyman Gantt stated that it was not the plan that he or the Speaker of the Assembly would have created, but "we are stuck with a situation that this is the only game in town, and we must do that." *Id.* He noted the importance of the Legislature acting affirmatively: "I don't take pride of authorship [of the proposed plan], but the fact is I think the legislature should not abrogate its responsibility to pass a plan in the state." *Id.* at 31. It was understood that if the Legislature failed to adopt the referees' plan, then the special master's incumbent-unfriendly plan would take effect. *See, e.g., id.* at 12; Ex. R of Silver Opp. Sum. Judg., Senate Tr. at 93, 95.

The Assembly also noted that the federal special master's plan created three majority-Latino districts, while the state plan by the referees created only two. Assemblyman Roberto Ramirez explicitly explained this principal difference between the two plans:

> It is interesting, political gerrymandering has been the traditional role of the state legislatures throughout this country. It is inconceivable that in 1992 the state court system of New York has now become a gerrymandering arm of the New York State Legislature.
>
> There is no question in my mind that the federal master's map enhances the Puerto Rican–Hispanic community's opportunity to elect three candidates of their choice.

We should not accept anything less. That is why I will vote against this congressional districting bill.

> It has been said much more eloquently than I could ever say it, that it does not matter how you add it up, three is better than two. I know that in the business of politics, oftentimes, we manage to muddle the issue. This is a clear issue, three is better than two.

Ex. Q of Silver Opp. Sum. Judg., Assembly Tr. at 26–27. Assemblyman Vito Lopez similarly railed against the bill because it proposed only two majority-Latino districts. He remarks, in a part of his almost seven pages of transcript:

> I think there's three issues here: Equity, empowerment, and fairness.
>
> Equity and empowerment, I think you would have to ... vote no today.... It's almost mathematically impossible ... [t]here are almost 2 million people in New York City, and you need about 300,000 people per Congressional district to constitute a Latino–Puerto Rican Congressional seat. It almost has to be planned to be exclusive of the Latino community. And do you know something? I know people will do their voting today, but if this was your group, if this was the farmers or if this was the African–American community, if this was a Republican community, people would be outraged. The Latino community is going to be a victim.
>
> . . . .
>
> Well, boy, oh, boy, there's a barrier today. There's an institutional barrier that says we're not going to have three Latino members of Congress....
>
> Then the other issue that I made reference to is fairness. And this is where we always lose. What is fair? So, on one hand, people will say, 'Well, look, ... we have to weigh the poor incumbents to the needs of the Latino community.' Again, we lose....
>
> . . . .
>
> ... When you vote for this plan, you're voting against the Latino community.

*Id.* at 41–43.

Like Assemblymen Ramirez and Lopez, Assemblyman Angelo Del Toro argued that

the referees' plan failed to maximize Latino representation in New York City:

> I think we should not be passing this bill today.... I think that one thing is clear, that even the state order that Mr. Gantt has referred to has to go before the federal Voting Rights Act, and I will guarantee you, that this is not the end of this discussion. It is clear, by the numbers, that a third Hispanic seat, two of them in northern Manhattan and the Bronx, and one in the Brooklyn–Triborough District, Queens and Manhattan were possible, and, that our *community* in New York City is totally mobilized to ensure that we get a fair reading.

*Id.* at 17–18.

Assemblyman Gantt had sought to preempt these criticisms, contending, as did the referees, that the plans creating three majority-Latino districts were not viable. He stated: "[T]here is an opinion by some people that those districts, some of which were drawn in the federal plan, were not necessarily winnable for minorities." *Id.* at 16. Assemblyman Del Toro responded:

> [I]n a city where over 52 percent, and we know that that is an under-count of the minority population, is minority. We have to take every opportunity we can to fairly break up the number of minority Congressional seats to approximate what that percentage of the population should be.
>
> ....
>
> ....
>
> I don't believe that this legislature should be a party to anything that smacks of racial and ethnic gerrymandering.... I don't believe that we should necessarily draw these districts to protect incumbents whatever they may be.

*Id.* at 18–19.

Assemblyman Clarence Norman, Jr., however, explained why he supported the adoption of the referees' plan rather than the special master's plan.

> Hailing from Brooklyn, and contemplating the devastation on the possible retention of our Afro–American Congressman in Brooklyn, Major Owens, and their towns in particular, I realize that the only alterna-

tive we have is to support this plan. But, when I think of Congressman Owens' district as proposed under the federal plan, his minority population would drop from 92 percent to 56 percent, thereby placing him in jeopardy. As well, Congressman Towns' purported district would take him way into Queens, an area which has very little in common with his present political base. So, as such, these two Congressmen would be in severe jeopardy of being reelected, and even if they were reelected, the possibility of the African–American communities to be able to elect succeeding African–Americans to those seats would be highly unlikely.

> So, in looking at the two plans and juxtaposing the two, I am, indeed, compelled to support the plan that is before us.

*Id.* at 56. Assemblyman Albert Vann spoke similarly, recalling that "[o]ver the years, I have ... earned a reputation for being for the empowerment of people of color [and support the Latino cause], ... I'm saddened that we cannot be together on this.... But the federal plan may create three districts for the Hispanic community in this state, but it jeopardizes three of the four seats that are held in New York City by African–Americans." *Id.* at 47–49.

In addition to the extensive discussion of the division of minority districts between Latino and African–American voters, the Assembly also acknowledged that protection of incumbents explained the shape of some of the districts in the referees' plan. For example, Assemblywoman Deborah Glick stated: "There has been a clear attempt to gerrymander based on personalities, personalities and the intention to protect the incumbents." *Id.* at 23. Some members of the Assembly seemed particularly concerned about the manner in which the plan divided communities to protect incumbents. Assemblyman Sullivan lambasted the plan's division of communities:

> [T]here is another thing, a community, people move into a town presumably because they want to move and live together. They want to be part of a community, and they have a right to be represented as a

community, unless they live in Manhattan, then they are all carved up like salami.

We have a law in the state which says if you draw legislative lines, you must respect communities. Not in Manhattan, you can carve us up like we don't care, it does not matter to us.

*Id.* at 7–8.

### (2) The State Senate

Although, as previously noted, incumbency as a redistricting criterion was not explicitly mentioned in the referees' report, its significance in the development of the referees' plan was openly acknowledged in the State Senate debate. Senator Dean G. Skelos, the proponent of the bill adopting the referees' plan in the New York State Senate, noted the state's congressional delegation's widespread support for it:

The Federal Master's Plan was overwhelmingly rejected by the New York congressional delegation, as the plan would have deprived many communities of the working relationship they have built up with their representatives. The legislation before us has received strong support from the congressional delegation both Republicans and Democrats.

. . . .

. . . .

The plan preserves the area of the current districts for the five minority districts with incumbents.

The plan preserves the cores of existing districts.

Ex. R of Silver Opp. Sum. Judg., Senate Tr. at 36–37.

The emphasis given incumbency was, however, strongly criticized. State Senator Martin Connor objected to the weight given to incumbency at the expense of community in the referees' plan:

We've now, to serve both the interests of incumbents, of constituency continuity—you know, part of preserving incumbents, if you read the cases, Mr. President, talks about preserving the continuity of constituencies. That was the nice way the courts used to talk about protecting incumbents, not by looking at the office holder but by

saying to keep intact the basic confines of an existing district and maybe add onto it. While it resulted in the incumbent's election or re-election, it preserved the continuity of the constituency.

. . . .

. . . .

Because as I look at this plan, I mean it's unfathomable to me that you can go from Westchester by a little one-block long thing into Queens and you can go from Sheepshead Bay all the way up the Westside of Manhattan. It may serve certain incumbents well, but it doesn't serve, I think, the people in the neighborhoods....

. . . .

. . . .

. . . .

I don't think [the plan is] fair. I don't think it does as good a job of giving representation to Hispanics as other proposals we saw earlier coming from legislative houses and there's proposals that have come from the Federal Master's Plan, and I think that's a very, very serious fault in this plan. I don't think we ought to adopt a plan whose architects obviously so protected incumbents that they denied Puerto Rican and Hispanic voters an opportunity for enhanced representation. So I intend to vote no.

*Id.* at 88–89, 90, 92.

State Senator Emanuel R. Gold also argued that the significance granted to incumbency in the plan was improper. He contended that one of the referees in the state case should have disqualified himself from the case because he "has ties to the Brooklyn Democratic organization. There were chits to pay even to a Congressman partially from Queens...." *Id.* at 47. He continued:

I spoke to people, and people say, well, you know there's eighteen Congress people involved, and sixteen of them like it. Sixteen what like it? Sixteen selfish political people just like we are that look at their own little lines and say, "My God, my back side got saved." To hell with the people.

Under this plan, Queens County's two million people will be broken up and have seven congressional pieces.

*Id.* at 53–54.

Senator Skelos, however, sought to justify the shape of the 12th CD with the need to comply with the perceived requirements of the VRA:

I think you should also point out that sometimes that's [extremely thin areas of districts] necessitated by the creation of minority districts in neighboring communities to satisfy the Voting Rights Act.

*Id.* at 42.

Jeremy S. Weinstein, a Senator from Queens, did not accept this explanation and objected to the shape of many districts, accusing the referees of unacceptably dividing communities.

[I]t looks like for several miles, is set one block long, cutting right through ... Queens County ... so that it then spreads out like a spread of wings to pick up other communities. Do you think that's an acceptable way?

*Id.* at 68. He continued with the sarcastic comment: "It was not done for the Voting Rights Act. For what purpose was it done?" *Id.* at 70. Demanding that the Senate enact its own plan, he questioned Senator Skelos: "But it's [the proposed bill] not as good as what you could accomplish?" *Id.* at 71.

In responding to Senator Weinstein's comments and questions, Senator Skelos answered:

[T]here was an agreement [between the Assembly and Senate in March 1992] that was 90 percent complete, and what I believe happened ... here is that the Court and the referees took into account by looking at the various plans of the two houses and then resolved what may have been the outstanding issues between the two houses.

*Id.* at 71.

Senator Franz Leichter also opposed the proposed bill and concluded his remarks by stating:

I hope that the courts will look at this, will look at the fact that they have this

plan that is so terribly political and without having come through the proper political process, and I hope the courts or the Justice Department as they look at it will not view this as the Legislature's plan, because it isn't.

*Id.* at 86.

Senator Olga A. Mendez agreed with Senator Gold and also couched the Senate's impending decision in racial terms, questioning whether it would adopt the referees' plan, which created one new Latino district, or yield to the adoption of the special master's plan, which created two. Senator Mendez contended that although the special master's plan would increase Hispanic representation, it was being overlooked because it threatened incumbents. *See id.* at 61–63. She stated:

All right. We know that the demography has changed, and we know that the State of New York must eliminate three congressional districts. Must it be done at the expense, Mr. President, of the Puerto Rican and the Hispanic community?

*Id.* at 62–63. Several other senators similarly perceived the referees' plan to be unfair to Latino voters because it failed to maximize the number of majority-Latino districts. *See id.* at 75–82.

### (c) Adoption of the Referees' Plan

Despite the protestations concerning the referees' plan's failings and unfairness, the Legislature passed the plan on June 10, 1992 and the Governor signed it almost immediately thereafter.

The Governor took care to mention that he would have preferred a plan that created three majority-Latino districts:

[T]he Legislature has now chosen simply to adopt in legislation the plan created by the state court saying it is close to what they might have done ... In my judgment, the failure of the state court plan to create three Latino districts ... violates the provisions of the Voting Rights Act.

Ex. S of Silver Opp. Sum. Judg., Governor's Statement Explaining Bill Signing.

He explained, however, that he would not veto the legislation containing the referees'

plan because the special master's plan "is even worse for representing our citizens, ignoring the cores of existing communities and applying a novel 55% majority standard for districts, which as it has been applied produces demonstrably weaker minority seats." *Id.*

### (8) Department of Justice Pro–Clearance

Section 5 of the VRA requires "the chief legal officer or other appropriate official" of a state to submit to the U.S. Attorney General any change in voting procedures in a "covered jurisdiction." 42 U.S.C. § 1973 (Supp. 1994). Bronx, Kings and New York Counties were and are covered jurisdictions. Thus the proposed reapportionment scheme could become effective only if the U.S. Attorney General approved the plan. As required by § 5 of the VRA, the Legislature submitted the redistricting legislation to DOJ for pre-clearance. *See* Ex. DD of Silver Opp. Sum. Judg., DOJ Submission; Ex. 4 of Popper Decl., DOJ Submission.

DOJ had adopted regulations implementing § 5 of the VRA. *See* 28 C.F.R. Chap. 1, Part 51. These regulations specify that "the chief legal officer or other appropriate official ... or by any other authorized person on behalf of the submitting authority" provide the necessary information to the Attorney General. 28 C.F.R. § 51.23(a). Section 51.27 describes the required information: paragraphs (a) and (b) require copies of the existing law and proposed changes; paragraph (c) requires the submitting party to explain the reasons for the change:

> (c) If the change affecting voting either is not readily apparent on the face of the documents provided under paragraphs (a) and (b) of this section or is not embodied in a document, [the submission must include] a clear statement of the change explaining the difference between the submitted change and the prior law or practice, or explanatory materials adequate to disclose to the Attorney General the difference between the prior and proposed situation with respect to voting.

28 C.F.R. § 51.27(c). Based on the submission, DOJ would assess whether the changes violate § 5 or § 2 of the VRA.

Senator Dean G. Skelos, "[o]n behalf of the Senate," and Assemblyman David F. Gantt, "[o]n behalf of the Assembly," wrote to the Chief of the Voting Rights Section of DOJ, submitting the required information and requesting pre-clearance. In their submission, under the section "Analysis of Change to Previous Law (51.27)(c)," they emphasized the importance of the referees' report, stating: "The Report of the Referees to Justice Shaw explains in detail the background leading up to the development of this plan by the referees for the State Supreme Court. . . . This law, incorporating the state court plan, is being submitted for preclearance. The Report of the Referees follows." Ex. 4 of Popper Decl., DOJ Submission. Thus, the Referees' Report, attached as necessary supporting information, was sent to DOJ in order to explain the proposed changes in the districting plan. Indeed, the referees' report was the only explanation offered to describe the revisions.

DOJ responded to the Legislature's submission on July 2, 1992. *See* Ex. G of PRLDEF Opp. Prelim. Inj. In granting approval, the Acting U.S. Assistant Attorney General stated:

> The Attorney General does not interpose any objection to the congressional redistricting plan. Our review persuades us that, as required by Section 5, the state has demonstrated that this redistricting legislation was neither designed to discriminate against minority voters nor does it have a retrogressive effect on their voting rights.

*Id.*

### (9) Latino Disapproval of the Referees' Plan

Latino members of the New York Legislature had unanimously voted against the legislation. *See* Ex. D of Graber Decl. Opp. Prelim. Inj. In addition, the Puerto Rican/Hispanic Task Force of the New York State Assembly urged the Governor to veto the Legislature's plan, claiming that it diminished Latino voting rights. *See* Ex. C of

Graber Decl. Opp. Prelim. Inj. The Latino members of the New York Legislature instead advocated passage of the special master's plan created in the federal court. *See id.*

Once the plan was signed by the Governor and approved by DOJ, Latino legal advocates tried in two separate actions to block its implementation before the November 1992 elections. They argued that the plan violated § 2 of the VRA, maintaining that if an additional compact and cohesive majority-Latino district could be created, as it was in the special master's plan, then the state plan's failure to include this third Latino district must necessarily dilute Latino voting strength. *See Torres v. Cuomo,* No. 92–CV–5811, 1993 WL 33639 (S.D.N.Y., Feb.3, 1993); *PRLDEF v. Gantt,* 796 F.Supp. 698, 700 (E.D.N.Y.1992). Plaintiffs' motion for a preliminary injunction was denied in the Southern District of New York on August 13, 1992. *See* Ex. E of Graber Decl. Opp. Prelim. Inj.

**(C) Compactness of the 12th CD**

**(1) Description of the 12th CD**

Plaintiffs contend that the 12th CD is "extraordinarily contorted, irregular, and bizarre." Compl. ¶ 38. According to the plaintiffs, "[t]he 12th CD is an object of national ridicule because of its shape, and is derisively referred to in the national press as the 'Bullwinkle' district." Compl. ¶ 39; *see* Appendix A, enlargement of an official congressional district map, entitled "New York State, 1992 Congressional Districts," obtained from the New York State Board of Elections and marked to show the 12th CD. The 12th CD encompasses parts of three of the five boroughs of New York City and has approximately 813 sides, "us[ing] about 75 miles of perimeter to enclose less than 14 square miles of area." *Id.* ¶¶ 40–41, 45. This is one of the nine or ten least spatially compact districts in the United States. *See id.* ¶¶ 47–48.

Daniel Polsby, Professor of Law at Northwestern University, explains in his declaration submitted on behalf of the plaintiffs here that the 12th CD is comparable in shape to the North Carolina district struck down in *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), and the Georgia district struck down in *Miller v. Johnson,* 515 U.S. 900, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995). *See* Polsby Decl. ¶ 14. He further explains that the 12th CD is "naturally drawn on a smaller scale because it is located in the center of one of the most populous cities in the world." *Id.*

In the state court hearings, Professor Gartner describes how the 12th CD was constructed:

> What you see when you look at the concentration maps is a band of Hispanics that come across Northern Brooklyn . . . with a small incursion into Queens. And, if you forgot about the East River, it [the band of Hispanics] comes across Manhattan, into the Lower East Side.

> You then see a concentration of Hispanics in Sunset Park and a little bit in Red Hook, and you see a scattering of Hispanics, those Northern Queens Hispanics that I talked about, that we didn't choose to bring up into the Serrano district but we use here (indicating).

> And so what we did, as everybody did, is we drew a district that basically looked like this (indicating), with the three legs.

Ex. 7 of Silver Mot. to Dismiss, June 2 Tr. at 123–24. Three days later he continued:

> It's no disrespect to the drafters of this district to say it is aesthetically unpleasing. . . .

> Why do we drive down here (indicating)? The population concentration of Hispanics, and similarly in this instance the population concentration of Asians, tells you to drive down that far. We go as far, but not any further, than the Hispanic community goes in this area of Southern Brooklyn(indicating).

> Why this strange and peculiar configuration up here (indicating), of 12, as it wanders around? We seek to mimic the Hispanic concentrations up here (indicating), and the same thing in the band across Northern Brooklyn.

> . . . [T]here is a white population the so-called Grand Street Houses, here (indicating), which we brought out of that district

for the purpose of trying to keep as high as possible the Hispanic and Asian population in District 12.

Ex. 9 of Silver Mot. to Dismiss, June 5 Tr. at 243–44.

### (2) Tests of Compactness

Researchers have developed three principal measures of compactness. These measures are described in a Congressional Research Service Report dated May 24, 1994 that has been accepted as authoritative by all parties. It is entitled "Congressional Districts: Objectively Evaluating Shapes," by David C. Huckabee.

The three measures described in the report are: the geographical dispersion measure, the perimeter measure and the population score measure. The geographical dispersion measure attempts to quantify a district's diffuseness.[10] *See* Ex. 1 of Second Baer Affirm., Huckabee at 3–5. The perimeter measure uses the total length of a district's perimeter, presuming that the smaller the total length, the more compact the district.[11] *See id.* at 5–6. And the population score measure focuses on where people actually live, rather than strictly on geography to determine the differences in residential patterns.[12] *See id.* at 3–6. All of these measures use a scale from 0.0 to 1.0, designating 1.0 as most compact. The Huckabee report calculates these three compactness measures for every congressional district in the country, as well as mean scores for each state.

PRLDEF relies upon this report to argue that the 12th CD is not bizarrely shaped, especially by New York's standard. New York's average measure for geographical dispersion was 0.30, for perimeter 0.20, and for population 0.64. *See id.* at 17. PRLDEF points out that ten of New York City's fourteen congressional districts are below New York State's mean for perimeter score, and that nine are below New York State's mean for population score. *See* PRLDEF Mem. Opp. Sum. Judg. at 22. In addition, New York's Eighth Congressional District has the lowest dispersion and population scores in New York City. *See id.* at 22–23. The 12th CD has the lowest perimeter score. *See id.* at 23. Thus, PRLDEF intervenors conclude that the 12th CD "does not substantially deviate from New York's traditional" districting criteria. *Id.* at 25.

Plaintiffs, while conceding that the Huckabee report is authoritative, note that

New York's 'spread' is comparable to that of most other states, and especially the more populous states toward the right end of the spectrum [less compact]. Indeed, its average score ... is comparable to that of Texas, Georgia, and North Carolina, the three states where racial gerrymanders were struck down. Note also that the 12th CD, which scores a .122, would appear close to the lowest bar on the graph, in very select (non-compact) company.

Pltff Reply Mem. Sup. Sum. Judg. at 32–33. Furthermore, plaintiffs note that the 12th CD's perimeter score is a .021, "the very bottom of the New York 'spread,' and is among the lowest scoring districts in the nation." *Id.* The Huckabee report also informs that the 12th CD has the second lowest "dispersion" score in New York and ranks 427th out of 435 districts in the nation. *See* Ex. 1 of Second Baer Affirm., Huckabee at 41. Similarly, the 12th CD's population score is the 422nd lowest in the country and

---

**10.** One geographical dispersion measurement compares the length and width of the longest axis in a district. However, this measurement can give a "near perfect rating to devious, unnatural figures such as" a snake which curls itself around so that its head and tail are close to each other. Ex. 1 of Second Baer Affirm., Huckabee at 3. Another way of measuring the diffuseness of a district is to compare the district area with the area of a compact figure such as a star or triangle. Still another looks to the district's center of gravity.

**11.** Perimeter measures use the total length of a district's perimeter. The usefulness of such a measure is affected by whether the state borders are straight, but is not affected by the absolute size of the districts. *See id.* at 5–6.

**12.** One type of population dispersion measure compares the total population contained in the smallest circle that can be drawn around the district with the population of the district. Another makes the same comparison using a polygon constructed with the fewest number of lines that can be drawn around the district.

tied for second-lowest in New York. *See id.* Finally, the 12th CD has the lowest "perimeter" score in New York and ranks 428th in the nation. *See id.*

**(D) History of This Litigation**

Plaintiffs brought this action in June 1995, anticipating the Supreme Court's decision in another racial gerrymandering case, *Miller v. Johnson,* 515 U.S. 900, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995). Plaintiffs requested a three-judge panel, pursuant to 28 U.S.C. § 2284(a), as this action challenges the constitutionality of the redistricting process. This court certified the reapportionment claim to be heard by a three-judge court despite defendant Silver's objection. Pursuant to 28 U.S.C. § 2284(b)(1), the Chief Judge of the United States Court of Appeals for the Second Judicial Circuit appointed this panel to hear this case.

Defendant Silver then filed a motion to dismiss the case which is still pending before the court.[13] Plaintiffs began preparing a motion for preliminary injunction pending the

outcome of the argument before the Supreme Court in *Bush v. Vera,* —— U.S. ——, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996). PRLDEF, on behalf of defendant-intervenors Lopez and Acosta, then sought intervention. The court allowed them to submit briefs responding to the plaintiffs' motion for a preliminary injunction. *See* Order, signed by Judge David G. Trager, dated May 14, 1996. In addition, at the July 1 hearing, the court allowed all parties who so moved to intervene. This included those represented by Wooten and AALDEF, as well as Congresswoman Carolyn B. Maloney. In addition, Delco Cornett intervened for the plaintiffs at the hearing.

On July 17, 1996, this court denied plaintiffs' motion for a preliminary injunction.

Plaintiffs now move for summary judgment, as has defendant-intervenor PRLDEF.

**Discussion**

■ Plaintiffs maintain that the redistricting plan adopted by the New York State Legislature violates their Fourteenth and

---

**13.** The motion by defendant Silver to dismiss this case is based on the claim that it was barred by res judicata as *PRLDEF v. Gantt,* No. 92–CV–1521 (E.D.N.Y.1992), and *Reid v. Marino,* No. 9567–92 (N.Y. Sup.Ct. Kings Cty.1992), determined the districts to be constitutional. This court now finds that not to be the case. Silver argues that because Latinos—presumably including the present plaintiffs—objected to the enactment of the referees' plan, they are bound by the holding of those two cases that the present plan is constitutional.

To be barred from bringing an action, privity must exist between the plaintiffs in this action and those in the prior action. *See Phillips v. Kidder, Peabody & Co.,* 750 F.Supp. 603, 606 (S.D.N.Y.1990). The Restatement (Second) of Judgments provides that privity only exists where some legal or consensual relationship between the parties exists. Restatement (Second) of Judgments § 41(1). None of the plaintiffs in this action was a party to *Reid.* Moreover, none of the plaintiffs was a member of any plaintiff, defendant or intervenor organizations in *Reid. See* Decl. of Angel Diaz, Reynaldo Coholo, and Denise L. Motley, attached to Robert Popper's Decl. Although defendant Silver argues that African-American and Latino voters were represented in the state court action, thus claiming that the present plaintiffs are precluded, he is wrong. Insofar as this argument rests on the argument that plaintiffs, because they are Latinos, were represented in *Reid,* it contains the same type of racial stereotyping condemned by the Supreme Court in *Batson v. Kentucky,* 476 U.S. 79, 89, 106

S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986) and in *Shaw v. Reno,* 509 U.S. 630, 648, 113 S.Ct. 2816, 2827, 125 L.Ed.2d 511 (1993). Thus, res judicata does not apply here.

Moreover, the issue raised by plaintiffs in this action was not addressed at all in the state court action. Plaintiffs do not desire the same outcome as the plaintiffs and intervenors in the state action, and "indeed, they desire opposite outcomes." Pltff Mem. Opp. Silver Mot. to Dismiss at 14. Here, plaintiffs are arguing that they were segregated on account of their race by the New York State Legislature's redistricting plan in violation of their constitutional rights. In *Reid,* the issue being addressed was the completely contrary claim that the State Legislature failed to consider race sufficiently when adopting its plan.

Apart from the difference in parties and issues, where there exists a major change in constitutional law, as has occurred here, res judicata may no longer apply. *See Snyder v. Newcomb Oil Co., Inc.,* 194 A.D.2d 53, 60, 603 N.Y.S.2d 1010 (4th Dep't 1993) ("Res judicata and its related doctrines are flexible, not absolute, and give way in extraordinary circumstances such as a change in the law.") (citations omitted). In the earlier litigations in state and federal court, Latinos were arguing that § 2 was not complied with unless the maximum number of majority-minority districts are created. The claim here is based on new law developed subsequent to those cases. *See Miller v. Johnson,* 515 U.S. 900, 923–28, 115 S.Ct. 2475, 2492–94, 132 L.Ed.2d 762 (1995).

Fifteenth Amendment rights by treating them differently under the law and by abridging their voting rights on account of race. *See* Compl. ¶ 66–67. They predicate this claim on their contention that race was the predominant factor used by the Legislature to determine the boundaries of New York's 12th congressional district.

According to plaintiffs, the referees' redistricting plan "implies that the ethnic background of Hispanics is determinative of their character, more so than political or cultural influences, and thus, insults and stigmatizes the Hispanic residents of the 12th CD." *Id.* ¶ 56. Similarly, because the number of African–American voters within the 12th CD was intentionally limited, the plan causes African–American voters "to be treated differently under the law on account of their race." *Id.* ¶ 58. And, "by creating a tri-partite district system, in which there are (1) 'Hispanic' districts, (2) 'black' or 'African–American' districts, and (3) 'white' districts, the Referees' Plan creates a racially separate, and inherently unequal, district system, in which the voting rights of plaintiffs are diminished." *Id.* ¶ 62.

In their cross-motion for summary judgment, defendant-intervenors rebut plaintiffs' claims. They argue that the arguably racial

intent of the referees cannot be ascribed to the New York State Legislature, whose principal purpose for adopting the referees' plan was to protect incumbents. They also argue that while not compact, the Legislature created the 12th CD to protect incumbents and to embody communities of interest. The supremacy of these concerns thus subverts the contention that race was the predominant factor in the Legislature's adoption of the redistricting plan. Furthermore, they claim that compactness of districts is not a traditional criterion under New York law, and, consequently, the New York State Legislature was privileged to ignore that criterion in favor of incumbency.

Analysis of these contentions requires us to determine: 1) whether the facts of this case warrant the application of strict scrutiny to the Legislature's adoption of the 12th CD, and if so, 2) whether the act of the Legislature satisfies the strict scrutiny standard. The Supreme Court has articulated a "variety of formulations for the application of strict scrutiny" in the redistricting context. *Bush v. Vera,* 517 U.S. 952, ——, 116 S.Ct. 1941, 1951, 135 L.Ed.2d 248 (1996) (plurality opinion).[14] Justice O'Connor's plurality opinion clearly established that "[f]or strict scrutiny to apply, the plaintiffs must prove that other, legitimate districting principles were

---

14. Justice O'Connor proceeds to list some of the formulations:

> Strict scrutiny applies where "redistricting legislation ... is so extremely irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of voting, without regard for traditional districting principles," or where "race for its own sake and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines," and "the legislature subordinated traditional race-neutral districting principles ... to racial considerations."

*Bush,* —— U.S. at ——, 116 S.Ct. at 1951 (quoting *Shaw v. Reno,* 509 U.S. 630, 642, 113 S.Ct. 2816, 2824, 125 L.Ed.2d 511 (1993) and *Miller v. Johnson,* 515 U.S. 900, 911–13, 915–17, 115 S.Ct. 2475, 2486, 2488, 132 L.Ed.2d 762 (1995)) (citations omitted).

In its brief, PRLDEF, quoting Justice O'Connor's plurality opinion out of context, recasts the opinion to omit the requirement that traditional districting principles be race neutral, and adds a requirement that for a prima facie case, plaintiffs must establish a deviation from the state's traditional districting criteria.

> *Shaw* and its progeny require plaintiffs to prove two elements to establish a prima facie case. They must prove both that (1) the district substantially deviates from the State's traditional redistricting criteria and (2) that race was the predominant motivation for the State's substantial deviation.

PRLDEF Mem. in Opp. Sum. Judg. at 10. The first requirement is not to be found in the plurality opinion, and the second mischaracterizes the Supreme Court's test. As the full quotation of Justice O'Connor's citation to *Miller v. Johnson* in *Bush* makes clear, the relevant test is whether:

> race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district. To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, to racial considerations.

*Miller,* 515 U.S. at 916, 115 S.Ct. at 2488.

'subordinated' to race. By that, we mean that race must be 'the predominant factor motivating the legislature's [redistricting] decision.'" *Id.* at ——–——, 116 S.Ct. at 1951–52 (quoting *Miller v. Johnson*, 515 U.S. 900, 916, 115 S.Ct. 2475, 2488, 132 L.Ed.2d 762 (1995)). The following discussion will reveal both that the application of strict scrutiny is appropriate in this case and that the use of race in the creation and adoption of the 12th CD does not withstand strict scrutiny analysis. Thus we find that the 12th CD is unconstitutional as presently drawn.

**(A) Predominance of Race in the Plan**

The facts stated above portray in broad strokes the unquestionably race-based nature of the referees' redistricting plan. *See* Ex. Q of Silver Opp. Sum. Judg., Assembly Tr.; Ex. R of Silver Opp. Sum. Judg., Senate Tr.; Ex. B of PRLDEF Opp. Prelim. Inj., Special Master's Report; Ex. C of PRLDEF Opp. Prelim. Inj., Referees' Report. Both the referees' final report and the testimony of Dr. Alan Gartner provide direct evidence of the intent to segregate voters by race in the plan. The referees' report lists the strictures of population equality and the Voting Rights Act as most fundamental to their redistricting efforts, after which they considered traditional criteria. *See* Ex. C of PRLDEF Opp. Prelim. Inj., Referees' Report at 15. This prioritization demonstrates the predominance of race in their redistricting plan. Furthermore, the referees admit to having perfected their race-based redistricting through the use of a race-sensitive computer program, voter registration lists and surname dictionaries to identify Latino and Asian names. *See id.* at 33 n. 32.

Professor Alan Gartner described with great precision the race-sensitive methodology that guided the creation of the 12th CD.[15] Both the computer system's ability to depict racial concentrations and the perceived need to create an additional Latino district fostered the referees' racially-motivated plan.

Dr. Gartner stated that the referees subordinated all other districting criteria except equal population to racial concerns. *See* Ex. 7 of Silver Mot. to Dismiss, June 2 Tr. at 111; Ex. 9 of Silver Mot. to Dismiss, June 5 Tr. 236, 243–44.

In addition to these two indicia of specific intent, the shape of the 12th CD further evidences the primacy of race in the referees' plan. It alone may demonstrate that race was the dominant factor in its creation. In 1993, the Supreme Court first found that an oddly-shaped district in which each curve corresponds to a racial concentration may be evidence that voters are being segregated by race. "A reapportionment plan that includes in one district individuals who belong to the same race, but who are otherwise widely separated by geographical and political boundaries, and who may have little in common with one another but the color of their skin, bears an uncomfortable resemblance to political apartheid." *Shaw v. Reno*, 509 U.S. 630, 647, 113 S.Ct. 2816, 2827, 125 L.Ed.2d 511 (1993). Moreover, Justice O'Connor found that "[i]n some exceptional cases, a reapportionment plan may be so highly irregular that, on its face, it rationally cannot be understood as anything other than an effort to 'segregat[e] ... voters' on the basis of race." *Id.* at 646–47, 113 S.Ct. at 2826 (citation omitted).

In every redistricting case since *Shaw v. Reno*, the Supreme Court has considered, among other factors, the compactness of the challenged district to determine whether the shape of the district was based on racial considerations. *See Bush v. Vera*, 517 U.S. 952, ——, 116 S.Ct. 1941, 1952, 135 L.Ed.2d 248 (1996), *Shaw v. Hunt*, 517 U.S. 899, ——, 116 S.Ct. 1894, 1901, 135 L.Ed.2d 207 (1996), *Miller v. Johnson*, 515 U.S. 900, 917–21, 115 S.Ct. 2475, 2489–90, 132 L.Ed.2d 762 (1995). Moreover, the shape need not rise to the level of "bizarre" in order to present a cognizable equal protection claim. *See Miller*, 515

**15.** In their 3(g) statements, defendant-intervenors make much of the fact that Professor Gartner's statements were unsworn. *See* PRLDEF 3(g) ¶ 19. It is difficult to know what to make of this claim. We do note that the sole basis of the challenge is that the statements are not sworn.

Defendants do not question Dr. Gartner's expertise, nor do they impugn his integrity. Moreover, defendants in no way dispute that the referees relied on his analysis and recommendations when devising their plan.

U.S. at 912, 115 S.Ct. at 2486. The Supreme Court explained in *Miller* that:

> Shape is relevant not because bizarreness is a necessary element of the constitutional wrong or a threshold requirement of proof, but because it may be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines. The logical implication . . . is that parties may rely on evidence other than bizarreness to establish race-based districting.

*Id.* at 912, 115 S.Ct. at 2486.

As in these Supreme Court cases, the congressional district at issue here is unquestionably oddly shaped. Plaintiffs provided the court with large maps of the 12th CD that clearly demonstrate the magnitude of the distorted, elongated district. Not only does the district curve and weave among street blocks, at points it is connected purely by parks and highways, such as the Brooklyn–Queens Expressway. Plaintiffs allege that this 12th CD is "so bizarre on its face that it is 'unexplainable on grounds other than race.'" *Shaw v. Reno,* 509 U.S. 630, 644, 113 S.Ct. 2816, 2825, 125 L.Ed.2d 511 (1993) (quoting *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977)). Intervenors contend that in a city of peninsulas and islands, creating districts that are perfect circles is not a realistic possibility. This is quite correct, but an 813–sided district certainly was not required either. A map of the 12th CD, which is appended to this opinion, is perhaps the most telling evidence of the predominant role of race in the formulation this district's lines.

Defendants and intervenors argue that the 12th CD is no less compact than its sister districts in New York. It is true that New York's congressional districts seem to suffer a chronic lack of compactness. In fact, five of New York's congressional districts in 1992 ranked as the country's least compact districts (the 5th, 7th, 8th, 9th and 12th—8th or 12th being New York's worst depending on the standard of measure). *See* PRLDEF Mem. Opp. Sum. Judg. at 20; Richard H. Pildes & Richard G. Niemi, *Expressive Harms, "Bizarre Districts," and Voting Rights: Evaluating Election–District Appearances After Shaw v. Reno,* 92 Mich. L.Rev. 483, 564 (1993). "New York's mean level of dispersion ranked identically at .30 during both the 1980s and 1990s [in a range of 0.0 to 1.0]. Its mean perimeter score also remained identical, coming in at .20 during the 1980s and 1990s [a perfect score is 1.0]." *Id.* at 20–21. Citing the sorry state of compactness of districts in New York on the whole, defendants and intervenors thus maintain that the 12th CD is as compact as many others. Plaintiffs, however, point out that the dispersion score for the 12th CD is far below New York's average, "in very select (non-compact) company," ranking 427th lowest out of 435 total districts. Pltff Reply Mem. Sup. Sum. Judg. at 33.

Nevertheless, defendants maintain that the 12th CD is not bizarre because it is contiguous and the residents share a sense of community. As already described, the district at points is barely contiguous and, as will be discussed, *infra* at § D(2), no such community of interest exists.

### (B) Predominance of Race in Enactment and Approval of the Plan

Not only was race the predominant factor in the referees' creation of their redistricting plan, it was also paramount to the Legislature's enactment of the plan. The preeminence of race is evidenced in three ways: statements by legislators during the Senate and Assembly debates regarding the adoption of the plan; the plans and recommendations submitted by the Legislature's representatives to both the special master and the referees; and statements by legislators during hearings before the special master.

The Legislature was fully aware of the perceived need to create majority-minority districts within New York City. When proposing the plan to the Legislature, Assemblyman Gantt reviewed the criteria, including the racial criterion, the referees used to create the districts. *See* Ex. Q of Silver Opp. Sum. Judg., Assembly Tr. at 4. In fact, the majority of discussions among members of the legislature revolved around the reasons for the referees' creation of the oddly-shaped

districts. These geometric curiosities were justified by the VRA requirements of creating majority-minority districts, as well as the concerns as to whether an additional Hispanic or African–American district would be created. *See id.* at 17–20, 25–30, 41–47, 49–52, 57; Ex. R of Silver Opp. Sum. Judg., Senate Tr. at 37, 42–43, 67–72, 80–81, 82, 95–98, 105–07. Perhaps most informative is Senator Skelos' own statement explaining the cause of the 12th CD's shape:

> I think you should also point out that sometimes that's [extremely thin areas of districts] necessitated by the creation of minority districts in neighboring communities to satisfy the Voting Rights Act.

Ex. R of Silver Opp. Sum. Judg., Senate Tr. at 42.

Moreover, members of both houses of the Legislature submitted to the referees and special master versions of a redistricting plan that included a "tri-county Hispanic district" similar to the 12th CD. Ex. C of PRLDEF Opp. Prelim. Inj., Referees' Report at 26 n. 22; *see* Ex. B of PRLDEF Opp. Prelim. Inj., Special Master's Report at 37. The fact that both the Senate and Assembly created and submitted to the referees and special master a tri-county Hispanic district similar to the 12th CD renders absurd the argument that now they ought not be charged with drawing such a district.

Legislators also verbally embraced the primacy of race in redistricting during a hearing held by the special master. *See* Ex. L of Silver Opp. Sum. Judg., Special Master Hrg. Tr. at 13, 16–17, 88–92, 100–02, 107. These aforequoted statements exemplify the extent to which racial issues pervaded the special master's hearing.

Thus, the transcripts of the legislative deliberations and the submissions to the courts and subsequently to DOJ makes it abundantly clear that the need to comply with the perceived requirement of maximization of majority-minority districts was the predominant motive in the Legislature's adoption of the referees' plan, overriding any other concern including incumbency.

The Governor's statements also evidence awareness of the centrality of race to the redistricting process. Upon signing the redistricting bill, the Governor stated that the main objectives of reapportionment were to comply "fully with the Constitution and the Voting Rights Act." Ex. S of Silver Opp. Sum. Judg., Governor's Statement Explaining Bill Signing. He then discussed the federal and state courts' involvement in redistricting and summarized the differences between the plans: "[O]ne is generally perceived as better for Latino minorities, the other for African Americans." *Id.* The Governor continued to explain that although he urged the Legislature to alter the court-created plans, the Legislature refused: "Instead, the Legislature has now chosen simply to adopt in legislation the plan created by the state court saying it is close to what they might have done." *Id.* The Governor then criticized the Legislature for not working harder to create a plan with an additional majority-Latino district.

The Governor, nevertheless, signed the bill, acknowledging that the Legislature "has at least a continuing opportunity to amend this plan—which it should surely do...." *Id.* The Governor recognized that it was preferable for the Legislature to adopt the state court plan, which it then could amend, than to be saddled with the federal plan, which it could not easily alter.

**(C) The Legislature's Acquiescence in the Use of Race**

■ Despite the overwhelming evidence that race served as the predominant factor in the referees' creation of the 12th CD, both defendants and intervenors argue that the Legislature cannot be held accountable for its race-based nature. They argue that because non-racial considerations, particularly incumbency-protection, partially may have motivated the Legislature's acceptance of the referees' plan, the Legislature is not bound by the fact that race was the predominant factor in the creation of the 12th CD. We reject this argument on three grounds. First, whatever their non-racial concerns, by attaching the referees' report to their Department of Justice pre-clearance submission, the Legislature affirmatively adopted the race-based methodology and rationale

the referees used to create the plan. Second, the primacy of race is apparent on the face of the plan, and as such the Legislature ought be held accountable for such race-based redistricting. Third, recent Supreme Court cases reveal that in cases of racial gerrymandering, such as the one before this court, a legislature will be held responsible for the resulting constitutional violations in spite of contentions that the legislature was merely attempting to comply with the perceived maximization requirements of the Justice Department.

The DOJ preclearance procedures require the legislature to explain the development of its redistricting plan. The only evidence that Senator Skelos and Assemblyman Gantt (the signatories of New York's § 5 submission) provided to fulfill this requirement was the referees' report. See Ex. 4 of Popper Decl., DOJ Submission. Specifically, the Legislature's preclearance submission to the DOJ stated that the referees' report "explains in detail the background leading up to the development of this plan by the referees for the State Supreme Court." Id. Under the circumstances, where this is the only document used to justify the Legislature's action, this submission binds the Legislature as an adoptive admission to all of the statements and policies contained therein.[16] See Grundberg v. Upjohn Co., 137 F.R.D. 365, 369–71 (D.Utah 1991) (finding that drug protocol reports used by defendant when seeking FDA approval are admissible as adoptive admissions in product liability action). By using the referees' report, the Legislature authorized the referees to speak for it with regard to the methodology and development of the redistricting plan.

Moreover, the fact that this was the only document submitted to DOJ by the Legislature is significant not only for its affirmative reliance on this race-based report, but also for the absence of any explicit discussion of the primary role of incumbency. Courts have given weight to such omissions in submissions for § 5 preclearance. In Vera v. Richards, 861 F.Supp. 1304, 1339 (S.D.Tex. 1994), aff'd, Bush v. Vera, 517 U.S. 952, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996), the district court noted that "if incumbent protection was as important to the process as the State witnesses testified ... it is surprising that the State offered virtually no such evidence ... in its voluminous § 5 preclearance submission to the Justice Department." The same can be said here. Moreover, plaintiffs emphasize that, under Fed.R.Evid. 801(d)(2)(B), the referees' report and court transcripts are statements in which the Legislature has "manifested an adoption or belief in its truth."

PRLDEF takes issue with plaintiffs' use of the referees' report and their experts' testimony to impute racial motivations to the Legislature's adoption of the 12th CD. PRLDEF argues that because the Legislature did not create the plan itself or make an affirmative statement of adoption, such a conclusion cannot be reached here on summary judgment. See PRLDEF Mem. Opp. Sum. Judg. at 42–44. However, because the referees' and their experts' statements are admissions here, PRLDEF's argument fails. Moreover, the record that incumbency was always subordinated to race cannot be gainsaid. As discussed, infra at section (D)(1), the creation of the 12th CD prevented the protection of an additional incumbent. In addition, none of the defendants has offered, in their affidavits or memoranda, any description of the evidence that they would present at a trial to contradict this conclusion. The Legislature cannot distance itself from its race-based plan and now honestly assert that race was a secondary consideration to incumbency.

■ Furthermore, the Legislature should be held accountable for the racial intent em-

---

**16.** Moreover, during the Senate debate regarding the bill incorporating the referees' plan, Senator Gold acknowledged that the Legislature was adopting the plan's methodology:

Now, "We didn't do it," is that what you said? "We didn't do it; this is just the court." Well, baloney. The Supreme Court—"supreme" if you start at the bottom, in this case—didn't print this piece of paper. We printed it. We printed it. So by us printing it, you have now adopted that philosophy and you are about to now engage in one of the most horrendous things you could do to a county.

Ex. R of Silver Opp. Sum. Judg., Senate Tr. at 52 (discussing incumbency protection).

bodied in the redistricting plan because such intent is apparent on the face of the statute passed by the Legislature. As plaintiffs argue, the Legislature may be held liable for the referees' intent since a state actor may be charged with otherwise private discrimination by seeking to enforce it. *See Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 177–79, 92 S.Ct. 1965, 1973–74, 32 L.Ed.2d 627 (1972); *Shelley v. Kraemer*, 334 U.S. 1, 17–20, 68 S.Ct. 836, 844–46, 92 L.Ed. 1161 (1948) (holding that state enforcement of otherwise private restrictive covenants violated Equal Protection Clause). Here, of course, the referees were not private actors, but private individuals fulfilling a public function.

Defendants also argue that the Legislature ought not be held accountable for the racial premise of the plan because it was merely trying to act in accordance with perceived DOJ preclearance policy. We acknowledge that the redistricting process clearly forced the New York Legislature to perform the difficult task of walking a tightrope between the perceived requirements of the VRA and the Equal Protection Clause of the Constitution. Nevertheless, we cannot absolve the Legislature of its responsibility because it was acting according to the misguided and unlawful directions of DOJ. Although DOJ had not rejected a congressional districting plan in New York, in 1991 DOJ objected to the redistricting of the New York City Council, *see* Ex. P of PRLDEF Opp. Prelim. Inj., DOJ Ltr. dated July 19, 1991, and in 1992 objected to a proposed Assembly redistricting plan because of its treatment of "the northern Manhattan area." Ex. Q of PRLDEF Opp. Prelim. Inj., DOJ Ltr. dated June 24, 1992. There is no question that New York's legislators were cognizant of and concerned about the strictures of DOJ's interpretation of the VRA. *See* Ex. Q of Silver Opp. Sum. Judg., Assembly Tr. at 3; Ex. R of Silver Opp. Sum. Judg., Senate Tr. at 79, 85–89.

New York thus found itself in a position similar to the other states performing redistricting. Similar state action, based on prior DOJ expressions, have been rejected by the Supreme Court. The Supreme Court has found that DOJ had unlawfully interpreted the VRA to require the maximization of majority-minority districts. "Instead of grounding its objections [to districting plans] on evidence of a discriminatory purpose, it would appear the Government was driven by its policy of maximizing majority-[minority] districts. Although the Government now disavows having had that policy, the ... well-documented factual finding was that the Department did adopt a maximization policy. ..." *Miller v. Johnson*, 515 U.S. 900, 924–25, 927–28, 115 S.Ct. 2475, 2492, 2494, 132 L.Ed.2d 762 (1995) (rejecting such a policy as "a shortsighted and unauthorized view of the Voting Rights Act"). All of these legislatures have labored to develop their redistricting plans against the background of multiple preclearance objections and rejections by DOJ based on this misguided interpretation. *See id.* at 925–26, 115 S.Ct. at 2493; *Johnson v. Mortham*, 926 F.Supp. 1460, 1486 (N.D.Fla.1996). In fact, most of these majority-minority district plans were initially created in response to prodding by the Department of Justice. *See, e.g., Miller*, 515 U.S. at 905–09, 115 S.Ct. at 2483–84; *United States v. Hays*, 515 U.S. 737, 737–42, 115 S.Ct. 2431, 2433–34, 132 L.Ed.2d 635 (1995); *Shaw v. Reno*, 509 U.S. 630, 633, 113 S.Ct. 2816, 2819–20, 125 L.Ed.2d 511 (1993).

But the Supreme Court has not responded kindly to legislators' arguments that DOJ's interpretation of the VRA compelled their race-based redistricting plans. The Supreme Court has pointed out that the state legislatures could have requested a declaratory judgment from the District Court for the District of Columbia to resolve the issue. *See e.g., Miller v. Johnson*, 515 U.S. at 907–08, 115 S.Ct. at 2484.

*Bush v. Vera*, 517 U.S. 952, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996), provides facts most similar to the present case. Like the situation before this court, it was a "mixed motive case" in which the legislature conceded that one of its objectives was to create additional majority-minority districts, but also explained that competing goals (including protection of incumbents) impacted its redistricting. *Id.* at ——, 116 S.Ct. at 1952. The district court reviewed three basic factors. First, it considered the irregular shape of the three districts in question, noting that in

1980 Texas's plan ranked average in compactness and in the 1991 plan ranked among the worst in the nation in "compactness and regularity of its district shapes." *Id.* Second, the court perused the legislature's transcripts, finding explicit references to assuring majority-minority districts. *See id.* at —— ——, 116 S.Ct. at 1952–53. Finally, the court contemplated the computer program that aided the creation of the plan by "permitt[ing] redistricters to manipulate district lines on computer maps, on which racial and other socioeconomic data were superimposed." *Id.* at ——, 116 S.Ct. at 1953. The district court then concluded that race was the "predominant factor" affecting the creation of the districts. The Supreme Court affirmed the district court's decision in *Bush,* noting that "the direct evidence of racial considerations, coupled with the fact that the computer program used was significantly more sophisticated with respect to race than with respect to other demographic data, provides substantial evidence that it was race that led to the neglect of traditional districting criteria here." *Id.* Despite the conceded desire of the legislature to protect incumbents, these indicators of the supremacy of racial considerations (including a race-sensitive computer districting program) led the Supreme Court to find the *Bush* district unconstitutional.

Plaintiffs are, therefore, correct in their argument that the New York State Legislature must be held responsible for the intent embodied in the redistricting legislation that it has passed. "Even if it acts under pressure, it has chosen to act." Pltff Mem. Sup. Sum. Judg. at 14. The Legislature must bear responsibility for the constitutional violations in its plans, even if its actions were a consequence of pressure imposed by DOJ's erroneous interpretation of the VRA.

## (D) Subordination of Traditional Factors to Race in the Plan

Aside from the overwhelming—and essentially uncontested affirmative evidence that race was the predominant factor, defendants and intervenors have offered nothing to contradict the equally-powerful evidence that traditional, non-racial factors were also subordinated to race in the referees' creation and the legislature's enactment of the plan. As a preliminary matter, since we are dealing with issues of intent, the significance of the referees' repeated statements in their report that they considered "traditional criteria" only after considering race cannot be overstated. While the implementation of their plan confirms their intent, these statements alone demonstrate that all traditional districting criteria, including incumbency, were subordinated to race in the drawing of the 12th CD.

### (1) Incumbency

Defendant-intervenor PRLDEF relies upon the fact that the referees' plan protected incumbents to argue that the 12th CD was not the product of race-based districting. *See* PRLDEF Mem. Opp. Sum. Judg. at 40–42. There is no doubt that the peculiarities of some district lines reveal that protection of incumbents substantially affected the shape of the districts in the referees' plan. Yet while incumbency took priority over all other traditional criteria in the creation of the districts, nevertheless it was at all times still secondary to race. *See* Ex. C of PRLDEF Opp. Prelim. Inj., Referees' Report at 15, 30.

The referees' report does make mention of and pay deference to the notion of "displacement," a term we view as a proxy for incumbent protection.[17] According to the referees' report:

> For the constituents in each of the five present minority districts, the Referees' Final Plan displaces the least number.

> On the average, the Master's Final Plan "displaces" 58% of the constituents, while

---

17. Although the Assembly's interest in incumbency-protection led it to submit a statement to the federal court opposing the special master's plan in part on that ground, Ex. N of Silver Opp. Sum. Judg., Assembly Objections to Special Master Report at 14–15, no such candid expression of concern for incumbency can be found in the referees' report and the testimony by the referees and the experts who aided the referees. It is quite evident, however, that (after equality of population and race) the factors listed in the referees' report were not the actual priorities. Rather, incumbency protection was the third most significant factor in the referees' report.

the Referees' Final Plan "displaces" only 25%.

In the Master's Plan, four of the five districts displace more than 50% of the population, while in the Referees' Final Plan, no district displaces more than 39%. *Id.* at 51–52.

There is also no question that the Legislature likewise considered incumbency; nor was there anything improper in its doing so. The legislators voiced their quite legitimate concerns about the ability of representatives to maintain relationships they had already developed with their constituents. *See, e.g.,* Ex. Q of Silver Opp. Prelim. Inj., Assembly Tr. at 9, 54, 56; Ex. R of Silver Opp. Prelim. Inj., Senate Tr. at 88. More significantly, the powerful role that seniority plays in the functioning of Congress makes incumbency an important and legitimate factor for a legislature to consider.

Nevertheless, while incumbency explains, in major part, the final boundaries of various districts, without the factor of race, the 12th CD, as a majority-Latino district, would never have been created. A different district, to protect another incumbent, would have been the politically-desirable choice. However, the race-based maximization policy of DOJ led to the creation of a seventh majority-minority district and, consequently, eliminated the possibility of protecting still another incumbent.[18] The important role that incumbency played is best summarized as follows: only when the perceived racial requirements of the VRA were met did incumbency become the principal focus of the referees' plan, and incumbency was always sacrificed to meet these racial requirements. Incumbency was always secondary to race.

### (2) "Communities of Interest"

Maintaining a "community of interest" traditionally also has been considered a legitimate goal in creating a districting plan. Courts will find the existence of a community of interest where residents share substantial cultural, economic, political and social ties. *See. e.g., Wilson v. Eu,* 1 Cal.4th 707, 4 Cal.Rptr.2d 379, 407, 823 P.2d 545, 573 (1992) (en banc). In *Miller v. Johnson,* 515 U.S. 900, 907–08, 115 S.Ct. 2475, 2484, 132 L.Ed.2d 762 (1995), the Supreme Court found that the 11th Congressional District of Georgia failed to incorporate a community of interest. The district contained four discrete urban centers connected only by hundreds of miles of rural counties and narrow swamps. *See id.* The Supreme Court affirmed the Georgia district court's finding that the 11th Congressional District was unconstitutional. According to the Court, the 11th Congressional District

> lost the black population of Macon, but picked up Savannah, thereby connecting the black neighborhoods of metropolitan Atlanta and the poor black populace of coastal Chatham County, though 260 miles apart in distance and worlds apart in culture. In short, the social, political and economic makeup of the Eleventh District tells a tale of disparity, not community.

*Id.* (citation omitted).

Defendants and intervenors argue that the 12th CD is constitutional because it encompasses communities of interest among its Latino members and among its Asian members. We conclude that even if such a community exists within the Asian population of the 12th CD, none exists within the Latino population. Thus the claim that the 12th CD is constitutional because it satisfies the traditional "community of interest" criterion fails.

In support of their contention that a community of interest exists, state defendants observe that all residents of the 12th CD vote for the same candidates for mayor, comptroller and public advocate. *See* State Mem. Opp. Prelim. Inj. at 27. By this standard, every district wholly within the City, no matter how drawn, would constitute a community of interest. State defendants also note that, unlike congressional districts in upstate New

---

**18.** Plaintiffs argue that because there was no incumbent in the 12th CD, incumbency could not have been a factor considered more than race. However, although only the 12th CD is being challenged by the plaintiffs, the entire plan was created by the legislators at one time. Thus, because there are incumbents surrounding the 12th CD, incumbency could have been and was, in fact, considered.

York, the 12th CD is confined to a single media market. *See id.*

AALDEF, in particular, argues that the 12th CD embodies a significant community of interest of Asian–American voters who share the same cultural background, economic conditions, service organizations, and media market. The Asian communities of Sunset Park and Chinatown, according to AALDEF, regularly work together, attend the same health clinics, and shop in the same stores. *See* Tchen Aff. ¶¶ 18–38; Lau Aff. ¶¶ 52–55. In addition, the Asian–American community votes similarly, *see* Shen Aff. ¶¶ 6–18; Lau Aff. ¶¶ 46–51, originates from the same area and speaks the same dialect. *See* Tchen Aff. ¶ 24. However, according to Professor Arrington, "because of the different nationalities of Asians, they have no real community of interests and might not vote together." Ex. K of PRLDEF Opp. Prelim. Inj., Arrington Aff. ¶ 40. Nevertheless, since the record indicates that the Asian–Americans in the 12th CD are mostly of Chinese background, for purposes of these cross-motions for summary judgment we will assume that all Asian–Americans in the 12th CD have a community of interest.

However, similar claims by PRLDEF intervenors do not come close to demonstrating similar shared activities and interests on the part of the Latino population. Thus, unless one accepts the view (rejected repeatedly by the Supreme Court) that race alone can be equated with communities of interest, PRLDEF's argument that the Latinos of the 12th CD form a community of interest does not withstand examination.[19]

PRLDEF contends that the Latino community of interest is evidenced by the common form of discrimination that Latinos experience. *See* PRLDEF Mem. Opp. Prelim. Inj. at 57–67. The one piece of evidence that supports the argument that all Latinos form a community of interest is Professor Allan J. Lichtman's finding of racially polarized voting between Latinos and non-Latinos. *See* Ex. I of PRLDEF Opp. Prelim. Inj., Lichtman Decl. ¶ 7; *see also* Ex. J of PRLDEF

Opp. Prelim. Inj., "Preliminary Report on Racial Block Voting and Political Mobilization in New York City, as It Affects Proposed Congressional Districts" at 31. While important, polarized voting in and of itself fails to create a community of interest. Common employment, services, religion, economy, country of origin and culture are more relevant in determining whether a community of interest exists. *See Bush v. Vera,* 517 U.S. 952, ——, 116 S.Ct. 1941 1948, 135 L.Ed.2d 248 (1996); *Carstens v. Lamm,* 543 F.Supp. 68, 91 (D.Colo.1982); *Wilson v. Eu,* 1 Cal.4th 707, 4 Cal.Rptr.2d 379, 407, 823 P.2d 545, 573 (1992) (en banc). Defendants and intervenors have not provided this court with any information about such factors.

Plaintiffs, on the other hand, show in their affidavits and complaints that in fact Latinos do not share a community of interest. Indeed, there is compelling evidence in the record that there are serious differences among Latinos. Plaintiff Angel Diaz stated:

I know that these groups [Dominicans, Ecuadoreans, Panamanians, Mexicans, Cubans, Colombians] in fact have very different cultures and traditions. I also know that members of these groups would regard it as incomprehensible, or even as an insult, to suggest that what they have in common outweighs what is unique about them.

Diaz Decl. ¶ 6. Further, plaintiff Diaz notes that "the groups described as Hispanic or Latino differ in the foods they eat ... in their music ... dance ... [and] in the way they speak." *Id.* ¶¶ 8–10.

Additionally, and "[m]ost important for a politician, these groups tend to have different political concerns." *Id.* ¶ 12. According to plaintiff Diaz, who ran for office in the 12th CD in 1992, "the different Spanish-speaking groups vote differently. In the 1992 election I received very different levels of support from areas that contained different Hispanic groups." *Id.* ¶ 21. Indeed, Professor Arrington, an expert on whom the special master relied when devising his redistricting scheme, likewise found:

---

**19.** We think it important to note that this discussion casts doubt on the notion that all African–Americans in New York City constitute a community of interest, considering their diverse origins, cultural histories, economic statuses, and political and social ties.

Puerto Ricans may have very different concerns and interests than Hispanics from Central or South American countries. There may be disputes and inter-ethnic conflict between these groups. This would suggest that community of interest principles should lead to the formation, if possible, of a Puerto Rican district distinct from a district dominated by Dominicans, Colombians, and other Central and South Americans.

Ex. K of PRLDEF Opp. Prelim. Inj., Arrington Aff. ¶ 36.

Moreover, the record suggests that the 12th CD, in fact, destroys an existing community of interest. Diaz concluded his declaration saying: "The 12th CD actually cut up the communities of interest that did exist. It made no sense that people in Manhattan could vote in the 12th CD, while my neighbors of 27 years could not." Diaz Decl. ¶ 27.[20]

In light of defendants' failure to produce any evidence of community of interest, such as common country of origin, economy, political views and culture, no finding can be made that a community of interest among Latinos exists in the 12th CD. There is no evidence to demonstrate that all Latinos within the 12th CD share common agendas and concerns, unless race itself creates a community of interest. Furthermore, as plaintiffs have indicated, the 12th CD divided immediately adjacent Latino communities with shared social and ethnic backgrounds. *See* Diaz Decl. ¶ 27. In addition, even if we assume, as we do, that some portion of the Latinos in the 12th CD do encompass communities of interest, neither defendants nor intervenors have offered evidence that all Latinos in the 12th CD constituted a single community of interest, let alone enough evidence to create an issue of fact precluding the grant of summary judgment.

Finally, even if we were to assume that all Latinos in the 12th CD constitute a community of interest, the evidence compellingly reveals that communities of interest were not as important as race in the referees' redistricting. · Rather, whether such communities were respected by their plan would merely be the fortuitous byproduct of the REAPS computer program used to create the districting plan. REAPS made no effort to distinguish ethnicity among Latinos. As one of the experts assisting the referees noted: "[W]e produced a set of maps that show the concentrations of the three so-called 'protected classes' in New York City; in Census language: 'Non–Hispanic blacks, non-Hispanic Asians' and 'Hispanics.'" Ex. 7 of Silver Mot. to Dismiss, July 2 Tr. at 111. If, by chance, the referees captured any actual Hispanic community of interest in their plan, it was only through happenstance of the computer program, not by design. Certainly this is not persuasive that, given all evidence to the contrary, communities of interest were not subordinated to race in the referees' 12th CD plan.

In sum, the argument that all Latinos in the 12th CD constitute a community of interest is not soundly grounded in fact. Thus we reject defendants' and intervenors' contention that community of interest played as

---

**20.** Although the point was made for other purposes, John Flateau, the Executive Director of the DuBois Bunche Center for Public Policy, who reviewed the reapportionment plan for the Wooten intervenors, implicitly supports plaintiff Diaz's complaint that he was separated from neighbors.

Thousands of Hispanic people were deliberately excluded from the Twelfth Congressional District precisely because the primary consideration was not race but incumbency protection. Many Hispanics [sic] communities and residents were included in the several congressional districts adjacent to the Twelfth Congressional District.

Aff. of Flateau ¶ 15.

Furthermore, the transcripts of the State Senate and Assembly debates reveal that legislators believed that the referees' plan disregarded and destroyed communities of interest. Assemblyman Sullivan lamented that people "want to be part of a community, and they have a right to be represented as a community, unless they live in Manhattan, then they are all carved up like salami." Ex. Q of Silver Opp. Sum. Judg., Assembly Tr. at 7. Senator Connor similarly stated that the plan "may serve certain incumbents well, but it doesn't serve, I think, the people in the neighborhoods...." Ex. R of Silver Opp. Sum. Judg., Senate Tr. at 90. Certainly the debates give no indication that the referees' plan was particularly effective at creating and preserving communities of interest, as defendants and intervenors argue here.

great or greater a role than race in the drawing of the 12th CD.

### (E) State Discretion in the Employment of Traditional Criteria

Defendant-intervenors contend that because compactness has not been a traditional districting criterion in New York, the fact that the 12th CD is not compact is not evidence that compactness was subordinated to race in its creation. Thus, they argue, strict scrutiny is not appropriate because, in New York, compactness is not a traditional factor that was subordinated to race. By comparing the 12th CD with other New York congressional districts both historically and in the 1992 plan, they argue that the 12th CD is compact by New York's own limited standard. They suggest, therefore, that "where a state, like New York, traditionally does not use aesthetic compactness criteria, expressive harms would be incurred by imposing such criteria through a 'federal common law' of compactness." PRLDEF Mem. Opp. Sum. Judg. at 12. Although we agree with defendant-intervenors that states have ample flexibility to choose among traditional districting criteria, we do not believe that they may permit race to become, de facto, the predominant factor.

We take issue with their argument in three ways: 1) when pushed to its logical conclusion it would completely undermine Supreme Court precedent; 2) as a matter of law, if not fact, compactness has been and is a traditional districting criterion under New York law; and 3) PRLDEF's argument that disregarding New York's criteria would result in "expressive harms" turns the *Bush v. Vera,* 517 U.S. 952, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) decision on its head.

First, the logical conclusion of defendant-intervenors' argument is that if compactness, incumbency, or other traditional factors have *not* played a role in a state's districting plans, the legislature is free to ignore them. While the Supreme Court might well allow states to give greater weight to incumbency than compactness, it can not be accepted that the Supreme Court would permit states to employ their own "traditional" districting criteria if the net result would be to permit race

de facto to become the dominant factor in the drawing of district lines. Although flexibility in defining traditional criteria to account for state variations is, no doubt, needed and desirable, a state's "traditional criteria" can not be permitted to undermine the teachings of *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), and its progeny. Otherwise, states may simply make race the predominant or even the sole factor by choosing to disregard all other districting criteria and then claiming that they were not "traditional" criteria within the state.

Moreover, although not necessary to our decision, we think it important to note that PRLDEF's argument that "traditional criteria" under New York law do not require respect for compactness is not supported by the record. To support this argument, PRLDEF introduced evidence of a long history of non-compact and even non-contiguous districts from 1799 to the present. *See* PRLDEF Mem. Opp. Sum. Judg. and Appendix B. Plaintiffs respond that this appendix of approximately fifteen districts out of thousands over the course of 180 years does not prove that compactness has not been a traditional criteria. Rather, plaintiffs maintain that this evidence demonstrates that the Legislature and courts normally do consider compactness when creating districts. *See* Pltff Reply Mem. Sup. Sum. Judg. at 38–39. Plaintiffs' argument concludes: "[A]ll of what the PRLDEF Intervenors assert in their historical narratives could be conceded without contravening plaintiffs' showing that the 12th CD invaded three counties and garnered some of the worst compactness scores in the nation, solely in order to pull Hispanics within its borders." *Id.* at 39. We agree.

It should be pointed out that, contrary to PRLDEF's position, in the Assembly's objections to the special master's report submitted to the federal court, counsel for the Assembly wrote: "[T]he Master and Expert were not free to ignore the need to create compact districts and to preserve communities of interest." Ex. N of Silver Opp. Sum. Judg. at 5.

In any event, even if the Legislature has at times created non-compact legislative as well as congressional districts, New York law

clearly indicates that compactness is a state requirement, and no reason has been suggested for treating compactness for congressional districts differently from the compactness requirements for New York's Senate and Assembly districts.

Compactness is a traditional districting criterion under New York law. Since 1946, the Constitution of the State of New York has expressly incorporated compactness and respect for political boundaries into the requirements for New York's Senate and Assembly districts. N.Y. Const., Art. 3, §§ 4 and 5 (1946). The New York City Council Charter also includes the same requirement for city council districts. N.Y.C. Charter, Chap. 2–A, § 52 (attached to Popper's August 14, 1996 Decl.). Additionally, the Court of Appeals in *Schneider v. Rockefeller*, 31 N.Y.2d 420, 428, 340 N.Y.S.2d 889, 293 N.E.2d 67 (1972) (citations omitted) held: "[W]e are of the opinion that the standards for State legislative and congressional apportionment are substantially the same." The New York Court of Appeals went on to explain:

> [T]he constitutional requirements of compactness [and] contiguity .... were adopted for the salutary purpose of averting the political gerrymander and at present are the only means available to the courts for containing that pernicious practice. If the Legislature plays fast and loose with these constitutional requirements, it risks having a districting plan set aside.

*Id.* at 430, 340 N.Y.S.2d 889, 293 N.E.2d 67.

Thus, it is apparent that even if the compactness criterion has been breached here, compactness traditionally has been considered a standard by the New York State Legislature and certainly by its courts, regardless of any federal mandate. Plaintiffs have also demonstrated that the 12th CD, which traverses three counties in New York City, has 813 sides, and is connected merely by highways at certain points, probably violates the compactness criterion of New York law, and certainly does not comport with federal law.

Finally, defendant-intervenor PRLDEF quotes *Bush v. Vera*, 517 U.S. 952, ——, 116 S.Ct. 1941, 1962, 135 L.Ed.2d 248 (1996) for the proposition: "Significant deviations form [sic] traditional districting principles [ ... ] convey the message that political identity is, or should be, predominantly racial." PRLDEF Mem. Opp. Sum. Judg. at 12. From this misquotation, PRLDEF derives the conclusion:

> That is, where a state, like New York, traditionally does not use aesthetic compactness criteria, expressive harms would be incurred by imposing such criteria through a 'federal common law' of compactness. This harm would result because only a majority-minority district would be required to be aesthetically compact, conveying that race was the basis for political identity in those districts.

*Id.* PRLDEF both seriously misstates and misconstrues the law. First, it fails to acknowledge that it has excised the middle portion of the *Bush* quotation. The quote, in full, states: "Significant deviations from traditional districting principles, *such as the bizarre shape and noncompactness demonstrated by the districts here,* cause constitutional harm insofar as they convey the message that political identity is, or should be, predominantly racial." *Bush,* 517 U.S. at ——, 116 S.Ct. at 1962. This is precisely the harm this court is seeking to avoid.

Second, PRLDEF's argument is premised on the proposition that only majority-minority districts would be compelled to comport with a compactness requirement. The fact that a district is not compact is strong evidence that the district was drawn for non-race-neutral reasons. *See Bush,* 517 U.S. at ——, 116 S.Ct. at 1961 (" 'Shape is relevant ... because it may be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines.' ") (quoting *Miller v. Johnson,* 515 U.S. 900, 913, 115 S.Ct. 2475, 2486, 132 L.Ed.2d 762 (1995)). However, the fact that a district is compact does not immunize it from scrutiny. Compactness or its absence would not itself excuse racially motivated districting. Thus, for example, if in Brooklyn, which in many areas is predominantly minority, a Caucasian Assembly dis-

trict (whether compact or not) is drawn for race-based reasons, its constitutionality would be equally suspect. Nowhere in the *Bush* opinion, or, for that matter, anywhere in recent Supreme Court jurisprudence, does the Court deviate from the maxim that all districting principles must be applied in a race-neutral fashion. In fact, *Bush* firmly stands for this rule of race-neutrality. Thus, PRLDEF's argument is utterly inapposite.

### (F) Strict Scrutiny

Plaintiffs have demonstrated that race was the predominant factor in the creation of the 12th CD. They have also demonstrated that all traditional redistricting criterion were subordinated to race. Defendants have failed to raise a genuine issue of material fact with regard to either issue. Therefore, we review the 12th CD under a strict scrutiny analysis to determine whether the district is constitutional. *See Bush v. Vera,* 517 U.S. 952, ———— ————, 116 S.Ct. 1941, 1951–52, 135 L.Ed.2d 248 (1996). Thus, we must decide whether "the racial classifications embodied in [the 12th CD] are narrowly tailored to further a compelling state interest." *Id.* at ———, 116 S.Ct. at 1960. Specifically, in light of the arguments pressed by defendants and intervenors, this requires us to determine 1) whether compliance with the Voting Rights Act is a compelling state interest; and 2) if so, whether the creation of the 12th CD was an act narrowly tailored to achieve such compliance.

### (1) Compliance with the Voting Rights Act

The relevant sections of the VRA for our purposes are §§ 2 and 5. Section 2(a) of the VRA provides: "No voting ... practice or procedure shall be imposed or applied by any State ... in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color...." 42 U.S.C. § 1973(a). Section 2(b) of the VRA articulates a "results" test for a violation of § 2(a):

A violation of subsection (a) ... is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election

in the State ... are not equally open to participation by members of a class of citizens protected by subsection (a) ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973(b). Section 5 of the Act requires that a state seeking to change a voting practice or procedure receive either preclearance for the change from DOJ or a declaratory judgment in the United States District Court for the District of Columbia that "such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color...." 42 U.S.C. § 1973c.

Although the Supreme Court has yet to determine specifically whether compliance with the VRA is a compelling state interest, in Justice O'Connor's *Bush* concurrence she found that "the state interest in avoiding liability under VRA § 2 is compelling." *Bush v. Vera,* 517 U.S. at ———, 116 S.Ct. at 1970 (O'Connor, J., concurring). The four dissenters in *Bush* also found compliance with the VRA to be a compelling state interest; thus a majority of justices support the position that compliance with the VRA is a compelling state interest. *See id.* at ———, 116 S.Ct. at 1989 (Stevens, J., with whom Ginsburg, J. and Breyer, J. join dissenting), at ———, 116 S.Ct. at 2007 (Souter, J., with whom Ginsburg, J. and Breyer, J. join dissenting). Accordingly, for the purpose of adjudicating these summary judgment motions, the correctness of this proposition will be assumed.

### (2) The Narrowly–Tailored Test

Turning to the question of whether the creation of the 12th CD was an act narrowly tailored to achieve the purpose of compliance with these sections of the VRA, we begin with § 2.

### (a) Section 2 of the VRA

In 1986, the Supreme Court articulated a three-prong test "for finding that the threshold conditions for § 2 liability are present."

*Bush v. Vera*, 517 U.S. 952, ——, 116 S.Ct. 1941, 1961, 135 L.Ed.2d 248 (1996) (discussing *Thornburg v. Gingles*, 478 U.S. 30, 50–51, 106 S.Ct. 2752, 2766–67, 92 L.Ed.2d 25 (1986)).

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.... Second, the minority group must be able to show that it is politically cohesive.... Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed(3)27 to defeat the minority's preferred candidate.

*Thornburg v. Gingles*, 478 U.S. at 50–51, 106 S.Ct. at 2766–67 (citations and footnotes omitted). A minority group is precluded from claiming a violation of § 2 of the VRA in the absence of these three conditions. In other words, there is no threat of liability for noncompliance with § 2 unless the *Gingles* test is met.[21] If there is no threat of liability for noncompliance with § 2, then there is no justification for using race as the predominant factor in the creation of a district. Thus, the redistricting would fail the "narrowly tailored" component of the strict scrutiny test if the *Gingles* test were not met.

The Supreme Court elaborated on the *Gingles* test in *Bush*, 517 U.S. at ——, 116 S.Ct. at 1961. Preliminarily, the Court noted that "the district drawn in order to satisfy § 2 must not subordinate traditional districting principles to race substantially more than is 'reasonably necessary' to avoid § 2 liability." *Id.* The Court found that when districts are "bizarrely shaped and far from compact" because of "gerrymandering that was racially motivated and/or achieved by the use of race as a proxy," then compliance with § 2 of the VRA has not been narrowly tailored. *Id.* The Court predicated this conclusion on the view that " § 2 does not require a State to create, on predominantly racial lines, a district that is not 'reasonably compact.' " *Id.* (citation omitted); *see also Shaw v. Hunt*, 517 U.S. 899, ——––——, 116 S.Ct. 1894, 1905–06, 135 L.Ed.2d 207 (1996) ("[A] plaintiff must show that the minority group is 'geographically compact' to establish § 2 liability."). In other words, the protected class must be "geographically compact" in order to raise a § 2 claim.[22] Moreover, the Court held that "[i]f, because of the dispersion of the minority population, a reasonably compact majority-minority district cannot be created, § 2 does not require a majority-minority district...." *Bush*, 517 U.S. at ——, 116 S.Ct. at 1961.[23]

**21.** Note that "the *Gingles* factors cannot be applied mechanically and without regard to the nature of the claim." *Voinovich v. Quilter*, 507 U.S. 146, 158, 113 S.Ct. 1149, 1157, 122 L.Ed.2d 500 (1993). Thus, " 'majority bloc voting' " and " 'minority political cohesion' " must always be specifically proven. *Growe v. Emison*, 507 U.S. 25, 40, 113 S.Ct. 1075, 1084, 122 L.Ed.2d 388 (1993) (quoting *Thornburg v. Gingles*, 478 U.S. at 51, 106 S.Ct. at 2766–67). Furthermore, the Supreme Court cautioned trial courts to consider the "totality of the circumstances." *See Thornburg v. Gingles*, 478 U.S. at 79, 106 S.Ct. at 2781 (citation and internal quotations omitted); *see also PRLDEF v. Gantt*, 796 F.Supp. 681, 688 (E.D.N.Y.1992).

**22.** The Asian–American intervenors do not meet either element of the first requirement of the *Gingles* test. 478 U.S. at 50, 106 S.Ct. at 2766. The population of Asian–American citizens is not large enough to form a majority district and it is not geographically compact. The argument that the 12th CD's creation of an Asian–American-influence district demonstrates a narrow tailoring to achieve a compelling state interest is not persuasive. Even if we assume that influence

districts must be created in order to comply with § 2 of the VRA, *see Armour v. Ohio*, 775 F.Supp. 1044, 1060–61 (N.D.Ohio 1991) (protecting African–American citizens within one district with a 33% African–American VAP because the court believed that a VRA claim might exist if this significantly-sized minority was split); *Hastert v. State Bd. of Elections*, 777 F.Supp. 634, 654–55 (N.D.Ill.1991) (finding that the VRA extends protection to minority influence groups, but allowing a minority VAP of 4.9% to be split), the 12th CD encompasses far more than necessary to create an Asian–American-influence district, as such a district would only require combining Chinatown in Manhattan and Sunset Park in Brooklyn. The inclusion of the entire area of Queens was not necessary to achieve that result. Thus, the AALDEF intervenors do not provide a compelling justification for the creation of the 12th CD.

**23.** Most recently, the Supreme Court vacated and remanded a three-judge panel's decision upholding the constitutionality of a non-compact majority-Hispanic congressional district in Illinois. *See King v. Illinois Bd. of Elections*, —— U.S. ——, 117 S.Ct. 429, 136 L.Ed.2d 328 (1996),

In light of this *Gingles* "tailoring test," we find that there was no legal justification for creating the 12th CD to avoid a VRA § 2 violation. Aside from the fact that under strict scrutiny the burden is upon the defendants to show that the creation of the 12th CD was necessary to comply with § 2 of the VRA, they have offered nothing of substance to support the claim that the minority population meets the first prong of the *Gingles* test.[24] As elaborated in extensive detail previously, the referees and the legislature explicitly subordinated all traditional districting criteria to race in their respective creation and adoption of the 12th CD. But it can not be seriously suggested that the minority community within the 12th CD is compact by any standard of measure. No one looking at a map of the 12th CD could reasonably suggest that the district contains a "geographically compact" population of any race.

PRLDEF, nonetheless, maintains that for *Gingles* purposes the compactness of the district in question must be compared to the average compactness of the state's districts to determine if there is a substantial deviation. *See* PRLDEF Mem. Opp. Sum. Judg. at 49. According to PRLDEF, since there is no substantial deviation between the compactness of the 12th CD and the average compactness of New York, the 12th CD is narrowly tailored to meet the state's compelling interest in complying with the VRA. *See id.* at 48–51, 106 S.Ct. at 2765–67. PRLDEF's contention is without merit.

The 12th CD simply is not compact, even by New York standards. Its perimeter score is the lowest in New York and its dispersion and population scores are second-lowest. *See* Ex. 1 of Second Baer Affirm., Huckabee at 41. Although the actual numerical difference in compactness among New York districts may be small, on compactness scales that range from 0.0 to 1.0 differences of a tenth of one point are quite significant. The fact that New York, in general, is guilty of having non-compact districts does not abrogate the gross non-compactness of the 12th CD for *Gingles* purposes.

Moreover, we reject this argument because *Gingles* holds that § 2 embodies its own requirement of compactness regardless of the state's districting criteria. Even if a state's traditional districting standards exclude compactness (and we have found that New York's do *not* ), § 2 of the VRA requires consideration of compactness. Thus, since the 12th CD is not compact, it is not narrowly tailored to meet a compelling governmental interest.

### (b) Section 5 of the VRA

Defendant–intervenors' final contention is that the creation of the 12th CD was justified by a compelling state interest in complying with VRA § 5. In *Beer v. United States,* 425 U.S. 130, 141, 96 S.Ct. 1357, 1364, 47 L.Ed.2d 629 (1976), the Supreme Court found that § 5 articulates a narrow goal of "insur[ing] that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *See Bush v. Vera,* 517 U.S. 952, ——, 116 S.Ct. 1941, 1963, 135 L.Ed.2d 248 (1996) (quoting *Beer* ). In *Shaw v. Reno,* 509 U.S. 630, 655, 113 S.Ct. 2816, 2831, 125 L.Ed.2d 511 (1993), the Supreme Court held that "[a] reapportionment plan would not be narrowly tailored to the goal of avoiding retrogression if the State went beyond what was reasonably necessary to avoid retrogression."

According to these interpretations of the nature and mandate of the VRA, there was no need to create the 12th CD to assure compliance with § 5.[25] Since there were

---

*vacating and remanding King v. State Bd. of Elections,* 979 F.Supp. 582 (N.D.Ill.1996).

**24.** Although plaintiffs have moved for summary judgment and thus it is their burden to come forward with support that no genuine issue of material fact remains to be tried, *see, e.g., Borthwick v. First Georgetown Sec., Inc.,* 892 F.2d 178 (2d Cir.1989), the strict scrutiny test compels the state to show that its action is narrowly

tailored to advance a compelling state interest. *See, e.g., Eu v. San Francisco County Democratic Cent. Comm.,* 489 U.S. 214, 222, 109 S.Ct. 1013, 1019–20, 103 L.Ed.2d 271 (1989).

**25.** We find this to be true even acknowledging that the three-judge federal court in *PRLDEF v. Gantt* found that groups purporting to represent minority voters had established a prima facie case under § 2 of the VRA. *See PRLDEF v. Gantt,* 796 F.Supp. 681, 693 (E.D.N.Y.1992).

only five minority districts prior to the 1992 redistricting, there would have been no retrogression, and thus no § 5 violation, had the legislature created only six majority-minority districts rather than the seven they did create.[26] Anyone with an elementary knowledge of New York City geography and demographics could recognize that had the Legislature respected compactness and communities of interest, it easily could have created six majority-minority districts. The federal plan amply evidences this. The special master, placing compactness and community of interest ahead of incumbency-protection, created six reasonably compact majority-minority districts. Thus, there was no legal justification for creating the 12th CD to avoid a VRA § 5 violation. The 12th CD thus was not narrowly tailored for the purpose of complying with either § 2 or § 5 of the VRA, and, accordingly, fails to meet the strict scrutiny standard.

### Conclusion

As a result of DOJ's interpretation of the Voting Rights Act, race became the predominant factor used by the referees in creating the 12th CD and by the Legislature in adopting the referees' plan. The referees segregated voters by race, as evidenced by the criteria set forth in the final report and the testimony of their experts. Furthermore, the Legislature not only adopted the referees' plan, but itself specifically offered plans that segregated voters by race. The evidence demonstrates that, while protecting incumbency was a major factor in the redistricting, it was still secondary to race for both the referees and the Legislature. Neither the defendants nor the intervenors here raised an issue of material fact that counters

this conclusion. Finally, there has been no showing that the 12th CD is narrowly tailored to meet the arguably compelling interest of compliance with the VRA. The 12th CD fails to meet the compactness requirement of *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Nor does the need to comply with § 5 of the VRA justify the 12th CD. Prior to the 1992 redistricting, there were five majority-minority districts. Without the 12th CD, the 1992 plan had six such districts; thus there would have been no retrogression and no dilution—although a second Latino district, rather than a fifth African-American district, might have been required. Moreover, alternative districting plans that assure minority representation and non-retrogression and which avoid race-based districting are readily available and feasible. For the foregoing reasons, we conclude that the 12th CD was unconstitutionally drawn.

Accordingly, it is hereby ORDERED that:

1. plaintiffs' motion for summary judgment is granted and defendant-intervenor PRLDEF's cross-motion for summary judgment is denied;

2. the New York Legislature shall develop on or before July 30, 1997, a new Congressional redistricting plan in conformity with this court's opinion;

3. on or shortly after July 30, 1997, this court will hold a remedial hearing on the status of the Legislature's redistricting efforts; and

4. defendant Silver's motion to dismiss the case is denied. The Clerk of the Court is directed to enter judgment accordingly.

---

**26.** In *Bush*, Justice O'Connor implies that § 5 would not even require six majority-minority districts. "Nonretrogression is not a license for the State to do whatever it deems necessary to insure continued electoral success; it merely mandates that the minority's opportunity to elect represen-

tatives of its choice not be diminished, directly or indirectly, by the State's actions." *Bush*, 517 U.S. at ——, 116 S.Ct. at 1963 (finding, in part III(C) of the opinion, that VRA § 5 is not a predicate for seeking augmentation of minority representation).